Filed 9/13/21  In re G.S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re G.S., a Person Coming Under the Juvenile Court Law. | |
| | D078759 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J520441) |
| v. | |
| B.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Tilisha Martin, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

A petition filed by the San Diego County Health and Human Services Agency (Agency) pursuant to subdivision (d) of Welfare and Institutions Code section 300[1] alleged that B.S. (Father) sexually abused his child, G.S. Finding those allegations to be true, the juvenile court determined to exercise its dependency jurisdiction under the statute. Father now appeals the court's order, claiming there was insufficient evidence to support the court's findings. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

G.S. was born in March 2007 and assigned the female gender at birth.[2] G.S. has a twin brother, A. Beginning in 2017, when G.S. was 10 years old, Father began sexually abusing him. That sexual abuse continued on a frequent basis through 2019, when he was 12 years old.

G.S. reported the abuse began with cuddling that later became shirtless cuddling. In time, Father asked G.S. to remove his undergarments. The abuse progressed to G.S. assisting Father to masturbate per Father's request. Father taught G.S. how to masturbate and provided pornographic videos showing fathers with their daughters, which he watched with G.S.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] After the sexual abuse alleged in this case had ceased, G.S. began a gender transformation to the male gender and now prefers to be identified with male pronouns. Respecting G.S.'s preference, we hereafter refer to G.S. as "he" or "him."

Ultimately, Father digitally penetrated G.S. and had oral and vaginal intercourse with him.

G.S. began experiencing gender dysphoria in sixth grade, joined the San Diego Pride organization, began presenting as more masculine, became more uncomfortable with Father's actions, and asked him to stop. In April 2020, G.S. began individual therapy with Donna Chapman, a licensed therapist, to help him with his gender transition. In that same month he also attended a sexual assault awareness discussion and learned about sexual abuse and coercion. Realizing he had been the victim of sexual abuse, G.S. told a few San Diego Pride friends and adult leaders about Father's actions. In mid-May, G.S. told his mother, A.S. (Mother) about the abuse of him, including the vaginal touching. Mother asked G.S., "Did [Father] go inside you?" G.S. answered, "Yes." When Mother confronted Father with G.S.'s allegations, he had a panic attack, had a difficult time breathing, went outside and threw up, and then went for a walk. A friend picked Father up and drove him to the friend's home. Father returned to the family home the next morning. Mother allowed Father to return and told G.S. to not disclose Father's abuse to G.S.'s therapist because she was a mandated reporter.[3]

In June, in response to a hotline call regarding possible sexual abuse of G.S. and A., Jennifer Goddard, an Agency social worker, went to G.S.'s home and individually interviewed G.S., A., Mother, and Father. G.S. told Goddard that Father sexually abused him from 2017 through 2019, describing the progression and specific acts of abuse. He said he did not think Father had abused A. because he was male, and A. confirmed he had never been touched

---

[3]    In so doing, Mother apparently disregarded the advice of her sister (i.e., G.S.'s maternal aunt) to call child protective services (CPS).

by anyone in a sexual manner.[4] G.S. stated he was worried that Father might face legal consequences, his military career might be affected, and their family would face financial instability.

For his part, Father denied any sexual touching of G.S. Goddard also interviewed Chapman, G.S.'s therapist, who stated that G.S. had not fully disclosed to her Father's sexual abuse of him until mid-June. G.S. told Chapman there had been occasions when he had spent the entire night in Father's bed, such as when Mother was out of town in December 2018.

The Agency developed a safety plan with the family while it continued its investigation, and Father moved out of the family home. In mid-June, the Navy issued a protective order prohibiting Father from having any contact with G.S. or A. In early July, the Agency filed a section 300, subdivision (d) petition alleging that Father had sexually abused G.S. The court detained G.S. with Mother on the condition that Father remain out of the home.

During that same month, G.S. participated in a videotaped forensic interview in which he described the nature and progression of Father's acts of sexual abuse.[5] In particular, he reported that Father had sexual intercourse with him multiple times. Father also attempted anal sex on one occasion. G.S. stated that Father "violate[d]" him many times and then apologized, sometimes ejaculating in his vagina or on his face, mouth, or breasts. During

---

[4]    The circumstances strongly suggest that a single contrary reference in the hotline report to G.S. saying Father also sexually abused A. is an error, and the juvenile court could have properly treated it as such. In G.S.'s July 2020 forensic interview, he repeated his belief that A. "was not touched [by Father] in any way."

[5]    A videotape of that interview, along with a transcript of the interview, was subsequently admitted in evidence at the contested jurisdictional hearing.

vaginal intercourse, Father sometimes tried positions that hurt G.S., but when G.S. said "no" he would pull away immediately or within a few seconds.

In a July interview with Kimberly Harris, another Agency social worker, Mother described G.S. as a "straight-A" student, eloquent, charismatic, and a leader. She indicated that in mid-May G.S. had misrepresented to her that he was talking with his cousin after 9:00 p.m. when, in fact, he had actually been talking to a friend. Mother and Father then spoke with G.S. about honesty and integrity. G.S. subsequently left a note on Father's side of his parents' bed calling him a liar. Later that evening, G.S. disclosed the sexual abuse to Mother. In its jurisdiction and disposition report, the Agency recommended that G.S. remain with Mother on the condition she gained insight about sexual abuse and adequately supervised and protected him.

In an addendum report, the Agency reported that after his first in-person visit with Father, G.S. stated his preference to not have any more visits with him. Later, G.S. told Harris he was angry with Father because Father had not confessed to law enforcement what had happened, and that he did not care whether Father went to prison. G.S. said he hated Father and never wanted to see him again. He also stated he had been having nightmares and did not feel supported by Mother.

Dr. Shalon Nienow's medical examination of G.S. was within normal limits, but was nevertheless consistent with G.S.'s history and statements to her regarding sexual abuse. Dr. Nienow explained that a majority of examinations in child sexual abuse cases are normal or non-specific, regardless of the specific sexual acts involved.

In November, G.S.'s counsel filed a section 388 petition requesting that the court modify its prior order of supervised visits for Father and instead

issue a no-contact order, asserting that G.S. no longer wanted to see Father. The court granted the petition. Also in November, Father was arrested and charged with 10 felony counts of sexual abuse of G.S. G.S. completed a screening for depression, which showed he had suicidal ideation and met the criteria for posttraumatic stress disorder (PTSD). In December, Father's therapist reported that Father continued to deny having done anything wrong.

Over three days in February and March 2021, the juvenile court conducted the contested jurisdiction and disposition hearing. It received in evidence the Agency's reports, the videotape and transcript of G.S.'s forensic interview, and two exhibits offered by Father. During the jurisdictional phase, the court heard testimony from social worker Harris, G.S., and Mother. After considering the arguments of counsel, the court sustained the petition's allegations, finding them true by a preponderance of the evidence. It then proceeded to the dispositional phase and heard additional testimony from Harris and G.S. Following additional argument, the court declared G.S. a dependent of the court, ordered him placed with Mother, directed family maintenance services for Mother, and set a six-month review hearing date.

DISCUSSION

Father's sole contention on appeal is that there is insufficient evidence to support the court's finding that it has jurisdiction over G.S. In particular, he argues that G.S.'s statements regarding his alleged sexual abuse were unreliable and therefore cannot provide substantial evidence to support the court's findings.

1. *Applicable Legal Principles*

" 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is

6

within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645.) Section 300, subdivision (d) provides that a child is within the jurisdiction of the juvenile court and may be adjudged a dependent child of the court if the child has been sexually abused, or there is a substantial risk that the child will be sexually abused, by his or her parent or guardian. A section 300 petitioner has the burden to prove by a preponderance of the evidence that the petition's allegations are true and the child is therefore subject to the court's jurisdiction. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.)

On appeal, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137 (*Isabella F.*).) In so doing, we consider the entire record, draw all reasonable inferences in favor of the prevailing party, and then affirm the order if substantial evidence supports court's findings. (*Id.* at pp. 137–138; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329 (*Shelley J.*).) Substantial evidence does not mean "any" evidence, but only that evidence which is reasonable, credible, and of solid value. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) We do not consider the credibility of the witnesses or reweigh the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 (*Stephanie M.*); *Isabella F.*, at p. 138.) A finding is supported by substantial evidence if a trier of fact could reasonably make that finding in light of the entire record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393–1394.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823 (*Manuel G.*); *In re N.M.* (2011) 197 Cal.App.4th 159, 168 (*N.M.*).) On appeal, the parent has

7

the burden to show there is insufficient evidence to support the juvenile court's order. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103 (*Lana S.*); *N.M.*, at p. 168.)

2. *The Juvenile Court's Ruling*

In finding the petition's allegations true by a preponderance of the evidence, the juvenile court summarized its impressions of G.S.'s statements:

> "This court finds that [G.S.'s] demeanor, although he did not break down crying in his interview, here in this trial, nor did he break down crying in his interview with the forensic interviewer, this court could see the struggle of [G.S.] in trying to relay what occurred and trying to remember as much as he could about what had occurred. [¶] What is clear to this court is that the statements that [G.S.] made to various individuals were consistent. If he didn't know, he said he didn't know. This court did not find that [G.S.] was making up extra incidents that may have occurred. . . . He didn't try to pretend."

The court concluded: "So based on the information that the court has before it, the court believes that [G.S.'s] statements are reliable because they come from more than one source, and that he disclosed to various sources. And the information that he disclosed overall was consistent. Was it perfect? Absolutely not. But it certainly was consistent to the point that this court believes that there is a preponderance of the evidence that [G.S.] falls within [§ 300, subd. (d)] as pled, based on his description as to what . . . occurred between him and [Father]."

3. *Substantial Evidence Supports the Court's Jurisdictional Finding*

Based on our review of the record, we conclude that G.S.'s statements to Goddard and the forensic interviewer, as well as his testimony at the jurisdiction hearing, provide substantial evidence in support of the court's true finding, by a preponderance of the evidence, that Father sexually abused

8

G.S. as alleged in the section 300, subdivision (d) petition. In making its jurisdictional finding, the court noted, in particular, G.S.'s ages at the time of the alleged acts of sexual abuse (10 to 12 years old) and at the time of his testimony (13 years old), his demeanor during the forensic interview and jurisdictional hearing, and the consistency and reliability of his statements regarding Father's sexual abuse. In so doing, the court expressly found G.S.'s statements regarding Father's sexual abuse of him to be reliable and credible. Applying the substantial evidence standard in reviewing the court's jurisdictional finding, we view the evidence and draw all reasonable inferences therefrom in favor of that finding. (*Isabella F.*, *supra*, 226 Cal.App.4th at pp. 137–138; *Shelley J.*, *supra*, 68 Cal.App.4th at p. 329.) We do not consider the credibility of the witnesses or reweigh the evidence. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319; *Isabella F.*, at p. 138.)

In contending there is insufficient evidence to support the court's jurisdiction finding, Father understandably does not suggest that G.S.'s allegations, if believed, would not be sufficient to support the exercise of jurisdiction by the juvenile court. Instead he focuses on the surrounding circumstances to argue that G.S.'s statements regarding his alleged sexual abuse were unreliable.[6] In particular, Father notes that G.S.'s statements were not spontaneous and that G.S. disclosed the alleged sexual abuse to friends and/or mentors only after a sexual abuse awareness seminar and was susceptible to their undue influence. He also points out that A., G.S.'s twin

---

[6]  For purposes of disposing of this appeal, we elect, as Father requests, to address the merits of his insufficiency of the evidence contention even though the juvenile court cited alternative grounds for its jurisdictional finding (i.e., that Mother allowed Father to remain in the family home after G.S. informed her of the alleged sexual abuse). (See, e.g., *In re Drake M.* (2012) 211 Cal.App.4th 754, 762.)

brother, denied that Father had sexually abused him (A.).  He further complains that in describing the alleged sexual abuse, G.S. was unable to provide certain details regarding that abuse (e.g., specific dates of, or statements Father made during, the alleged acts of abuse).  Finally, Father emphasizes G.S.'s medical examination was normal and there was no other physical evidence to corroborate G.S.'s allegations of sexual abuse.

Still, the juvenile court was aware of and considered all of this evidence and nonetheless concluded that G.S.'s statements regarding Father's sexual abuse were reliable and accurate.  By arguing those circumstances would have supported a finding that G.S.'s statements were unreliable, Father misconstrues and/or misapplies the substantial evidence standard of review.  On appeal, we must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding.  (*Manuel G.*, *supra*, 16 Cal.4th at p. 823; *N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

In any event, we reject Father's assertion that the circumstances he highlights necessarily require a finding that G.S.'s statements regarding the alleged sexual abuse are inherently unreliable and therefore provide insufficient evidence to support the court's jurisdictional finding.  First, the lack of spontaneity of G.S.'s statements do not make them per se unbelievable.  Rather, spontaneity of statements—whether considered under Evidence Code section 1240 or otherwise—is merely one factor a court *may* consider in determining the reliability or veracity of a declarant's hearsay statements.[7]  (*In re I.C.* (2018) 4 Cal.5th 869, 891 (*I.C.*).)  Here, the court

_____

[7]     Evidence Code section 1240 provides:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) [p]urports to narrate, describe, or explain an act, condition, or event perceived by the

could (and did) reasonably find G.S.'s statements to be reliable even though he did not make those statements at the time of, or shortly after, the alleged acts of sexual abuse under the stress of excitement of his perception of those acts. (Evid. Code, § 1240.)

Second, although G.S. initially disclosed the alleged sexual abuse to friends and/or mentors after an April 2020 sexual abuse awareness seminar, the circumstances of that initial disclosure do not necessarily show he was unduly influenced by those individuals such that his statements are unreliable. Processing the information from the seminar may simply have led G.S. to reach his own conclusion that disclosing the abuse was the appropriate thing to do. Likewise, Father's assertion that G.S.'s descriptions to others of his sexual abuse "evolved" over time does not demonstrate that G.S. fabricated his allegations or was otherwise untruthful.[8] Rather, the court presumably considered the circumstances surrounding his initial disclosure, along with his subsequent statements to others, and weighed that and other evidence in finding that G.S.'s statements were credible. This is the sort of evidentiary evaluation appropriately left to trial judges as a result

declarant, and [¶] (b) [w]as made spontaneously while the declarant was under the stress of excitement caused by such perception."

[8]    Likewise, because in April 2020 G.S. disclosed to others the alleged sexual abuse by Father before disclosing it to Mother in May 2020, the discipline imposed by his parents in May 2020 for lying about his cell phone use prior to his disclosure to Mother does not support Father's assertion that G.S.'s previous April 2020 statements were motivated by anger or retribution for that subsequent discipline which had not yet occurred. Furthermore, because the court could reasonably find G.S.'s April 2020 statements were consistent with his subsequent statements, it could reasonably find that an anger or retribution motive did not play a part in G.S.'s statements regarding Father's sexual abuse and conclude his statements were reliable and truthful.

11

of their "observation of the witnesses, [and] . . . superior opportunity to get 'the feel of the case.' " (*Noonan v. Cunard S.S. Co.* (2d Cir. 1967) 375 F.2d 69, 71; see also *People v. Vivar* (2021) 11 Cal.5th 510, 528.)

Third, the fact that Father did not sexually abuse A.—G.S.'s twin brother—does not conclusively refute G.S.'s statements that Father sexually abused him (G.S.). To the extent Father argues that G.S.'s statements regarding abuse of A. were inconsistent and thereby made his other statements unreliable, we conclude the juvenile court could have reasonably found that the single record reference on which he relies was an error, such as a misunderstanding of G.S.'s statements by the original hotline reporter or a mistake in communicating his statements to the Agency. (See *ante*, fn. 4.) There are no other statements by G.S. in the record indicating that Father sexually abused A. His descriptions are all to the contrary. Of particular importance is G.S.'s specific assertion during his July 2020 forensic interview that A. "was not touched [by Father] in any way." Accordingly, the court could reasonably infer that G.S. consistently stated he was the only victim of Father's sexual abuse.

Fourth, although G.S. was unable to provide specific details regarding aspects of the abuse (e.g., specific dates of, or statements Father made during particular acts), the court could reasonably infer that in light of the many alleged acts of sexual abuse over that two-year period, G.S. as a victim of continuing sexual abuse might not recollect many of those details, but nevertheless might remember the specific types of the acts themselves and their progression. Accordingly, G.S.'s purported lack of recall regarding specific details does not conclusively show he fabricated the alleged acts of sexual abuse or that his statements were otherwise unreliable.

Finally, the fact that G.S.'s medical examination was normal does not, as Father apparently asserts, show that G.S. was not sexually abused. Dr. Nienow stated that G.S.'s medical examination was consistent with his history and statements to her of sexual abuse even though the physical examination was normal. She added that a majority of examinations in child sexual abuse cases are normal or non-specific, regardless of the specific sexual acts involved. Father cites no authority suggesting that a normal medical examination necessarily precludes a finding of sexual abuse, regardless of the specific type of abuse. Accordingly, none of the factors or circumstances identified by Father, whether considered individually or collectively, show that G.S.'s statements regarding the alleged sexual abuse were necessarily unreliable and therefore provided insufficient evidence to support the court's section 300, subdivision (d) jurisdictional finding.

Although he appears to concede the case is readily distinguishable on its facts, Father relies heavily on *I.C.*, *supra*, 4 Cal.5th 869, in support of his unreliability argument, suggesting we should consider the factors listed in that case and find, as a matter of law, that G.S.'s statements are not credible and therefore provide insufficient evidence to support the court's jurisdictional finding. The *I.C.* case involved various uncorroborated hearsay statements made by a presumably truth-incompetent three-year-old child that were widely inconsistent and, in certain respects, almost incredible on their face.[9] (*Id.* at pp. 888–889.) In contrast, in this case G.S. was 10 to 12

_____

[9] A truth-incompetent child is "a child who may not testify because [he or] she is too young to separate truth from falsehood." (*I.C.*, *supra*, 4 Cal.5th at p. 875.) Here, Father does not assert, nor could he reasonably assert, that G.S. was truth-incompetent. G.S. was 13 years old at the time of his statements and clearly knew the difference between truth and a falsehood and accordingly was competent to testify, and testified, under oath at the jurisdictional hearing. (Cf. *I.C.*, at p. 884 [truth-incompetent young children

13

years old at the time of the alleged sexual abuse and was 13 years old and very articulate at the time of his hearsay statements. Furthermore, the court here did not rely only on G.S.'s hearsay statements, but also considered his testimony at the jurisdictional hearing in evaluating his credibility.

Despite those factual and procedural differences, and even assuming we should consider some or all of the reliability factors listed in *I.C.*, we conclude none of them show that G.S.'s statements regarding Father's sexual abuse were unreliable as a matter of law and therefore could not provide substantial evidence to support the court's section 300, subdivision (d) jurisdictional finding.[10] The *I.C.* court listed "certain factors courts may consider in determining whether a child's hearsay statements satisfy this standard of reliability [i.e., special indicia of reliability]," including: (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; (4) lack of motive to fabricate; (5) ability to understand the duty to tell the truth and to distinguish between truth and falsity; and (6) any other factors bearing on reliability. (*I.C.*, *supra*, 4 Cal.5th at p. 891, citing *In re Cindy L.* (1997) 17 Cal.4th 15, 30, and *In re Lucero L.* (2000) 22 Cal.4th 1227, 1250 (plur. opn. of Mosk, J.).) Here, the juvenile court presumably considered most, if not all, of these factors and concluded that none, individually or collectively, made G.S.'s hearsay statements regarding Father's sexual abuse necessarily suspect. Through the lens of our deferential appellate standard of review, we

are unable to understand the duty to tell the truth under oath and therefore are disqualified to be a witness and testify at trial], citing Evid. Code, § 701, subd. (a)(2).)

10    Father does not contend on appeal that the juvenile court erred by not expressly or implicitly considering the reliability factors listed in *I.C.*, *supra*, 4 Cal.5th at page 891.

believe the juvenile court could reasonably conclude that consideration of these reliability factors did not compel a finding that G.S.'s statements regarding Father's sexual abuse of him were untruthful.  Father has not carried his burden on appeal to establish otherwise or show there is insufficient evidence to support the court's section 300, subdivision (d) jurisdictional finding.  (*Lana S.*, *supra*, 207 Cal.App.4th at p. 103; *N.M.*, *supra*, 197 Cal.App.4th at p. 168.)

DISPOSITION

The order is affirmed.


DATO, J.


WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

15