Filed 6/2/22  In re M.H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.H., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.B., <br><br> Defendant and Appellant. | G060816 <br><br> (Super. Ct. No. 21DP0787) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Anthony C. Ufland, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \*

A.B. (Mother) appeals from the juvenile court's dispositional order vesting physical custody of her now seven-year-old daughter, M.H., outside her care and continuing M.H.'s placement with her maternal grandmother. (Welf. & Inst. Code, § 361, subd. (c)(1), (c)(4).) Mother does not challenge the juvenile court's jurisdictional order sustaining allegations of recent sexual abuse by Mother's boyfriend Javier Belmontes and "another unknown adult," along with general neglect (failure to protect). (§ 300, subds. (b), (g).) The juvenile court entered those jurisdictional findings despite Mother's denial of "any knowledge of sexual abuse" and her denial of "any problem with substance abuse" that could pose a risk of harm to M.H. Rather, Mother contests the sufficiency of the evidence to support removing M.H. from her custody and, in a related argument, contends the court should have ordered family maintenance services rather than reunification services. The juvenile court in entering its removal order found "this is not even a close case." Ample evidence supports the court's order, which we therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2021, M.H. disclosed to a social worker that Mother's friend "Javi" touched her "private parts" with his hands and fingers, skin to skin. The abuse occurred while Belmontes and Mother were naked and "doing it," which M.H. described as Belmontes touching Mother's private area. According to M.H., Mother was aware that Belmontes was touching M.H. M.H. reported she was "asked not to tell anybody." M.H. later said she told Mother more than once that Belmontes was touching her private parts.

Mother was present for the initial interview; she had previously discouraged M.H. from speaking to social workers. Mother contradicted M.H.'s account,

2

stating that M.H. earlier had said that Belmontes was only "playing." Mother tried to terminate the interview but ultimately allowed it to continue; M.H. remained consistent in describing the abuse that occurred. When Mother told M.H. her allegations were false, M.H. insisted, "No, he touches me and you're always sleeping." The touching hurt M.H.'s privates. Mother initially refused to allow the social worker to interview M.H. alone. M.H. was "very clear" in her statements to the social worker alleging abuse and told the worker it occurred numerous times. M.H. later recalled Mother telling her that "Javi didn't do it."

M.H. also described Mother engaging in sexual activities with another unidentified person while M.H. was in the bed, which led M.H. to be fearful that person would also touch her like Belmontes had. To persevere, M.H. stated "she would just hug her plushy and cry."

M.H. had disclosed the abuse to several people before reporting it to the social worker. She also described the abuse in a Child Abuse Services Team (CAST) interview held five days after her initial interview. M.H. stated plainly in the CAST interview that "my mom is lying" when Mother contradicted her "about Javi touching her private parts." In addition to the touching that she had previously described on Mother's bed, during this interview M.H. disclosed Belmontes would sometimes approach her while she was sleeping in a bed that Mother made for her in a closet. He would put his hand inside her vagina, which M.H. described felt like a '"squeeze, squeeze, squeeze,"' and, when she awoke, he would return to bed with Mother.

M.H. was also exposed to pornography; M.H. told Mother, and she believed Mother "called Javi" about it. M.H. told several relatives and Mother about what Belmontes was doing to her, and Mother denied it. M.H. would ask Mother "why [is] Javi touching my privates? And she wouldn't answer." M.H. described how, when Belmontes lived in the home, "every time I go potty it hurt me," which ceased once she moved to her grandmother's house.

Mother described M.H. as "smart" and "more verbal than other kids." She claimed M.H. invented the abuse allegation after overhearing a friend of Mother's recount that "another little boy" had "put[] his face in her private parts." The social worker did not find Mother's explanation credible, and instead said her explanation was "inexplicable."

Mother claimed she had not seen Belmontes in more than a year; M.H. in contrast stated the abuse last occurred a "short time ago" when she was six years old. (M.H. turned six years old about nine months before her July 2021 interviews.) Belmontes had lived with M.H. and Mother for an unspecified time, during which Mother told M.H. that M.H. had "two daddies now."[1]

Mother described Belmontes as someone who was "there for us" and who helped her financially. At the time the sexual abuse came to light, Belmontes lived nearby. M.H. indicated in her initial interview that Mother would take a backpack filled with "White Claws" alcoholic drinks with her when going to see him. M.H. reported she did not feel safe with Mother when she drank White Claws or when she "smoke[d] weed." Mother's history of recent arrests included methamphetamine possession in 2020 and driving under the influence of an unspecified drug in 2019. Both criminal cases remained pending. Mother told the social worker that, contrary to her family's suspicions, she did not use drugs, nor did she abuse alcohol. M.H. reported that Mother "drinks 2 'White Claws' in the morning," which Mother denied.

---

[1] M.H.'s reported birth father's whereabouts remained unknown throughout the proceedings. The Orange County Social Services Agency (SSA or agency) previously investigated a report in April 2020 that Belmontes physically abused M.H., but they could not substantiate it; Mother and M.H. both "denied knowing an individual by the name of Jave." Earlier, in August 2018, allegations of general neglect involving Mother and M.H.—albeit without concerns of sexual or physical abuse of M.H.—were "taken for information only," and Mother was advised of non-agency resource options.

Soon after M.H. was detained and taken to Orangewood Children and Families Center (Orangewood), but before she was placed in the maternal grandmother's home, Mother called M.H. at Orangewood. Mother was only supposed to have monitored contact with M.H., but she managed to speak alone with M.H. briefly. When the monitor heard M.H.'s voice rising in volume, she picked up the receiver and heard Mother tell M.H. "that she needed to have a serious talk with her and that she would do that when she was released to Grandma Chrissy."

Once M.H. was detained, Mother sought and obtained a temporary restraining order against Belmontes, which, after a hearing in August 2021, ripened into a one-year order.

M.H. did not recant the abuse when placed with her maternal grandmother. M.H. said that Belmontes would stare at her private parts; she affirmed that he touched her vagina and disclosed that he pulled down her pants to do so; she also said that Belmontes took her into the bathroom and turned off the lights, but she did not say what occurred there. The grandmother observed that M.H. seemed ashamed to discuss some aspects of the abuse. The grandmother provided audio recordings of M.H. recounting the abuse. Once placed with the grandmother, M.H. said that she was "not afraid anymore." Nevertheless, she missed Mother but believed Mother was getting help "so that's okay." According to prior SSA contacts regarding M.H., Mother may have been sexually abused as a child.

The grandmother expressed concerns about Mother's substance abuse and history of "nothing but abusive partners." Her substance abuse included smoking marijuana in a vehicle with M.H.'s father while M.H. was present, and a car accident while under the influence. Before the dependency case arose, Mother generally would not allow M.H. to be alone with her maternal relatives and limited video calls with the grandmother. The grandmother believed Belmontes and Mother were in an intimate relationship contrary to Mother's claim they were "just friends."

5

The grandmother was "terrified" at the prospect of Mother reunifying quickly with M.H. because Mother failed to take "any responsibility for what has happened to the child." According to the grandmother, "she hasn't seen what she's done. She doesn't see how she's hurting her daughter. No self-awareness."

In mid-August 2021, the social worker received notice that Mother refused to complete her intake materials to participate in a sexual abuse prevention program (UCI Focus) to which she was referred. Mother expressed frustration that she was not informed that the program focused on sexual abuse. However, the social worker's report regarding her July contact with Mother reflected that SSA recommended she participate in counseling regarding sexual abuse with a parent education component. Mother in July had "agreed to complete all services." Yet in mid-August, Mother told the social worker she already had a therapist and did not want another one because she was worried "they would ask about allegations that the agency and court, 'don't even know [if] they're true. Doesn't make sense when I don't believe they're all true.'" She expressed further frustration that "I didn't do anything wrong for this to happen."

The juvenile court at the detention hearing had ordered random alcohol and drug testing as part of Mother's case plan. Mother's first test in early August 2021 came back positive for THC, the chemically active component of marijuana. Mother attributed the positive test to being around others smoking marijuana; she denied she had used it "in a long time." The social worker informed Mother that secondhand smoke could not trigger a positive test. While she had denied using marijuana, Mother subsequently furnished the social worker with two expired medical marijuana cards and a new one she obtained two days after learning from the social worker of her positive test result.

As the early September jurisdiction and disposition hearing drew near, Mother implored the social worker to attend a visit "to see that the child wants to be with her and to see how great visits are going." Mother told the worker she felt "she has gone 'above and beyond to do everything for [M.H.] and I to reunify' because she has a job,

6

has been participating in random drug and alcohol testing, and visits have been going well."

After a mid-August positive test for alcohol, Mother insisted she had "no[] clue" how that could be, given "I haven't drank alcohol in a long time."

The maternal grandmother expressed concern that Mother "seems to have an agenda" during visits that included focusing on M.H.'s sadness at the close of visits but, "instead of . . . comforting the child, she will start videotaping the child." According to the grandmother, who served as the visitation monitor, M.H. "loves her mother," but was still "scared to be returned to her."

SSA's jurisdiction and disposition report concluded that Mother "seems to not accept any responsibility for the abuse and trauma the child has experienced while in her care, despite . . . having [given] the child's abuser substantial access to the child who is young and therefore extremely vulnerable to abuse. The mother should have reasonably known that the child was being sexually abused in her care based on the child's statements. During the investigation, the mother has presented as being more focused on disproving the allegations against her and the need for court and agency involvement rather than supporting the child who has experienced great trauma . . . . The child has expressed now feeling safe in out of home care and seems to have a less than favorable perception of the mother based on her statements during the investigation." While the report reflected concern that Mother "may have an unresolved substance abuse issue," the social worker authoring the report also expressed belief that Mother "can mend this divide with the child in a therapeutic setting that addresses sexual abuse, where the child can work towards trusting the mother again."

The week before the jurisdiction hearing, Mother contacted the social worker to reverse course regarding the UCI Focus program, stating that she would like to participate. She stated she would also be enrolling in a parenting program and that she was "willing to do anything to expedite the child being returned to her." The social

worker submitted a new referral that day for Mother to the UCI program and provided Mother with the information for self-enrolling in a parenting education course, which Mother repeatedly was unable to do, claiming technical difficulties.

At the jurisdiction hearing on September 1, 2021, Mother "plea[d] nolo" to the dependency petition, which the juvenile court sustained and set the disposition hearing for the end of the month.

An addendum report submitted by SSA for the disposition hearing reflected that Mother attended the UCI Focus orientation session and was waitlisted to begin the program sessions pending dates and times that worked with her schedule.

Mother tested positive on September 10 for alcohol; she again denied it was possible. The social worker discussed the Alcoholics Anonymous (AA) program options Mother had agreed to attend as part of her case plan if she tested positive. Mother questioned testing at all for alcohol given that "it is legal, and she is of legal age"; still, she stated her willingness to attend AA "if she has to." Mother subsequently queried whether cold medication she thought she may have used (Dayquil and Nyquil) could cause her positive alcohol tests. The social worker's follow-up with the testing facility indicated the answer was no, "if it is used according to the manufacturer's instructions."

The social worker, maternal grandmother, and Mother testified at the disposition hearing.

The juvenile court made extensive findings before concluding by clear and convincing evidence that to vest physical custody "with the parents would be detrimental to the child." The court found the evidence supported the "serious and severe sexual abuse allegations" and that the "significant issues" resulting in the dependency jurisdiction were "probably tied in—intricately tied to substance use and abuse. And to date, I can't see that mother has engaged in attempting to address any of those."

The court observed that—including Mother's "open, pending DUI drugs" and methamphetamine cases, compounded by Mother repeatedly "testing positive"—the

8

record showed "absolutely a substance abuse history." Yet Mother's unsupported explanations for the positive marijuana and alcohol tests, "[f]ollowed by questioning why she can't drink," amounted to "excuses in the face of a substance abuse order related to getting custody of her daughter back."

More concerning, the court noted "minimization throughout Mother's testimony regarding Javi, what he did to the minor, almost painting Javi as a hero in saving her [i.e., Mother] from an abusive home . . . ." While Mother made "statements on the stand that she was disgusted and horrified," nevertheless "in terms of how she describes what actually happened," she said merely that "'Javi ended up sexually abusing her at some point.'" The court found the "minimization [as to] Javi and . . . what happened to [M.H.] . . . concerning."

The court found Mother's minimizing tendency indicated "that sexual abuse counseling is critical for Mother." While Mother made a last-minute decision to enroll in the UCI Focus program, "learning about how to protect her child from future sexual abuse" did not appear to be "number one on Mom's list" of priorities. Similarly, the court found puzzling "[t]he fact that she thinks that she doesn't need more parenting classes." This concerned the court in light of Mother's history of "trying to keep [M.H.] from sharing information . . . about what was going on." The court found that where Mother claimed "she was always there with [M.H.] and Javi," yet "this occurred . . . on her watch," Mother needed "'parenting classes at a minimum to teach'" preventative measures. As such, the court "d[id]n't understand [her] testimony that she doesn't believe she needs them."

The court emphasized it needed to be able to trust Mother in order to return M.H. to her care, but her excuses and denials of self-evident facts made it difficult to do so. Even as to a "relationship between Mother and Javi," for which the evidence was "overwhelming," the court observed that Mother "continues to deny that [existed]. There seems to be a denial or excuse for everything."

9

Reunification remained the juvenile court's top priority. The court noted "that can't happen until [M.H.] can safely be returned to the mother. And that's not going to happen until Mother addresses the substance abuse and the sexual abuse counseling. . . . It is up to Mother at this point to decide if she is going to take control of this and deal with it or not." Mother had not yet done so in concrete ways such as by completing her coursework or by consistently returning negative drug and alcohol tests— leading the court to conclude at the time of the hearing that "this is not even a close case." Nonetheless, the court expressed "hope that that changes."

Mother now appeals.

## DISCUSSION

Mother contends M.H. "should not have been removed from her . . . custody." She does "not challeng[e] the jurisdictional findings in this case," but instead challenges the sufficiency of the evidence to support removal. Mother argues the evidence was "lacking" in light of the protective steps she had taken—or had begun to take—by the date of the disposition hearing. She also suggests, in citing *In re James T.* (1987) 190 Cal.App.3d 58, 66, that this was *not* "one of the enumerated extreme cases" in which removal is statutorily authorized.

Contrary to Mother's claim, this is precisely the type of case in which at least temporary removal from parental custody is warranted. A dependent child may "be taken from the physical custody of his or her parents" when the minor "has been sexually abused, or is deemed to be at substantial risk of being sexually abused, by . . . [a] person known to his or her parent." (§ 361, subd. (c)(4).) There must be no "reasonable means" to protect the minor other than removal. (*Ibid.*) Similarly, an inability to protect the minor from "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home" likewise warrants removal. (*Id.*, subd. (c)(1).)

10

The juvenile court must find removal is necessary by the clear and convincing standard of proof. (§ 361, subd. (c).) We review the juvenile court's ruling for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""'" (*Ibid.*)

Mother bases her claim M.H. "did not have to be removed" largely on the fact that she had undertaken certain protective measures, such as obtaining a restraining order against Belmontes, and that she *stated* "she would do whatever was necessary" to have M.H. returned to her care. But in light of the catastrophic nature of sexual abuse (see *In re I.J.*, *supra*, 56 Cal.4th at p. 778) and the sustained allegations, the juvenile court reasonably could conclude that promises to act were not enough. This is particularly true where the evidence supported the court's credibility finding that Mother minimized the abuse. Such denial properly informs the juvenile court's risk of harm assessment. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 (*Esmeralda*).)

Here, the risk was not limited to abuse by Belmontes, since the evidence indicated Mother engaged in sexual conduct with others in M.H.'s immediate presence. Furthermore, while Mother cites her testimony that she moved out of Belmontes's home months before the sexual abuse allegations when she became concerned he was too "rough" with M.H., the juvenile court could take a jaundiced view of this self-serving account of her protective ability. Mother continued to associate with Belmontes though she knew M.H. feared him, and Mother herself had thwarted SSA's investigation into the earlier physical abuse allegations by denying she or M.H. knew "Javi." Substantial

11

evidence indicated Mother could benefit from the parenting and UCI Focus courses to learn to better protect M.H.

Yet Mother had only recently assented on the eve of the disposition hearing to parenting and sexual abuse prevention classes and had not actually yet taken any. The juvenile court could reasonably regard the classes to be an essential component for Mother to demonstrate she could protect M.H. when she had not done so in the past. Nor had she yet consistently provided clean drug or alcohol tests, which the juvenile court reasonably could regard as a risk factor for M.H. given evidence of Mother's risky behavior with alcohol and drugs. This included Mother's use of alcohol that added to M.H.'s fear when Mother continued to see Belmontes, as well as evidence of Mother's drug use with the father in M.H.'s presence and her unresolved criminal drug cases.

It is true, as Mother notes, that a lack of insight into *child* behavior (particularly that of teenagers) may not be sufficient to order continued removal from parental custody. (See *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288-292.) But the parent's own conduct raises a different issue. In *Jasmine G.*, the parents' remorse for and renunciation of corporal punishment was the opposite of the denial that presented a risk factor in *Esmeralda B.*, as Mother's minimization and equivocal statements regarding the abuse do here. Additionally, unlike Mother, the *Jasmine G.* parents both completed their parenting course. (*Jasmine G.*, at p. 285.)

Mother argues the evidence does not support that "removal . . . was the only way to ensure the wellbeing of" M.H., and that there were unspecified "means short of removal" to do so. She alludes to her testimony that she was "willing" to have the maternal grandmother assist her with childcare. But protecting M.H. was not a responsibility Mother could cast on others, particularly where that parental duty exists all day, every day (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 646), and cannot be met simply by unannounced agency visits (*In re V.L.* (2020) 54 Cal.App.5th 147, 158). A parent's "failure to recognize the risks to which [he or] she was exposing the minor

12

[leaves] no reason to believe the conditions would not persist should the minor remain in [his or] her home."  (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.)

Substantial evidence supported the juvenile court's dispositional order.  The social worker remained optimistic that Mother could mend M.H.'s broken trust, including by undertaking her coursework.  Although Mother had not done so by the date of the dispositional hearing, like the juvenile court, "[We] hope that that changes."

## DISPOSITION

The juvenile court's dispositional order is affirmed.


GOETHALS, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


MARKS, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13