Filed 8/8/22  In re M.L. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.L. et al, Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.C. et al., Defendants and Appellants. | E077599 (Super.Ct.Nos. J287762, J287763, J287764, J287765 & J287766) OPINION |

APPEAL from the Superior Court of San Bernardino County. Erin K. Alexander, Judge. Affirmed.

Vincent W. Davis and Margarita Karasik-McGee for Defendant and Appellant D.C.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant, M.L.

1

Tom Bunton, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

D.C. (mother) appeals a juvenile court's jurisdiction and disposition orders regarding her children, A.L., M.S.A.L., M.L., H.L., and M.L.L. (the children). She contends there was insufficient evidence to support the jurisdiction allegations against her and the removal of the children from her custody. M.L., Sr. (father) filed a separate brief arguing insufficient evidence with regard to the jurisdiction allegation against him and removal from his custody. Mother and father joined in each other's arguments. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On January 13, 2021, the San Bernardino County Children and Family Services (CFS) filed a Welfare and Institutions Code[1] section 300 petition on behalf of the children.[2] At the time, A.L. was 14 years old, M.S.A.L. was 10 years old, M.L. was seven years old, H.L. was five years old, and M.L.L. was one week old. The petition alleged that the children came within section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). It specifically alleged that both mother and father (the parents) had

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] CFS filed a separate petition for each child; however, since the petitions contain the same allegations, we will simply refer to them as one petition.

a substance abuse problem, the parents failed to provide the children with adequate provisions, and the parents were unable to benefit from previous CFS interventions.

The social worker filed a detention report stating that on January 7, 2021, CFS received a referral alleging general neglect of the child, M.L.L. He and mother tested positive for methamphetamine at his birth. The social workers went to the family's home for an unannounced visit and rang the doorbell twice, but no one answered the door. They observed that the backyard was full of large black trash bags. There was a glass beer bottle by the front door and several beer cans in the front yard.

The social workers met with the parents at the hospital and asked to speak with the parents separately, but father refused and stated he and mother would speak with them at the same time. Father reported that mother and the children would be staying with the paternal uncle in Victorville, while he finished remodeling the house. Father could not provide an address for the uncle, but only provided the uncle's contact information. Father stated he was currently not using drugs and the last time was "years ago." When asked, he said his drug of choice was alcohol. He stated he drank beer but not often, and the last time he had a beer was about two weeks prior.

Mother said she did not know how she could have tested positive for any drugs. She stated that she last used drugs in 2011 and her drug of choice was methamphetamine. When asked how she and the baby could have tested positive, mother stated that she was "stereotyped" by the hospital staff. She could not give a valid reason as to why she tested positive and continuously denied any current drug use.

3

The social worker called the paternal grandmother (PGM), who reported the parents and baby would be spending the night at her house in San Bernardino.

The following day, on January 8, 2021, father stated he had spoken with an attorney who informed him that the social worker did not need to speak with his other kids. The social worker thus obtained an interview warrant due to the family not cooperating with the department and denying access to the children. Father later called and stated that he was advised by his attorney to cooperate with CFS, and he would allow the worker to interview the children at the PGM's house. That day, the social workers, along with two sheriff deputies, went to the PGM's house and served the interview warrant. Father came out to the front gate with mother and stated that the warrant was not for the PGM's home and denied access to the home. However, he said the social workers could interview the children outside. The social worker spoke with the child A.L., who denied the presence of drugs in her parents' home and reported that father only drank alcohol at birthday parties, but "not much." When asked about the bottles observed by the front door of the house, A.L. said "we recycle a lot." The social worker also spoke with the child M.S.A.L., and he denied there being drugs and alcohol in his home. When asked about the beer cans outside of his home, he stated that the cans belonged to the neighbors. He denied seeing father drink alcohol. The child M.L. was also interviewed, and she said, "[D]ad drinks beer."

After the interviews with the children, father reported that he was remodeling their home, and they were staying at the PGM's home because "we are dealing with you guys." Mother was asked about her drug use again, and she said she did not use drugs

4

before having the baby. When asked how she tested positive for amphetamines, she stated that it "could have been the Halloween candy or falling when '[she] was sitting.' " She reported that she last used drugs a year and a half ago.

On January 11, 2021, the social worker spoke with the hospital social worker, who reported that M.L.L.'s meconium test results came back positive for amphetamine and methamphetamines, and his urine test was positive for amphetamine. CFS was worried that mother would continue to use drugs, which placed the children at risk of abuse and neglect because mother initially stated she last used methamphetamine in 2011 and then said it was about a year and a half ago; she also denied current drug use.

During the investigation, the social worker discovered that the parents had an extensive dependency history. The parents' older children were removed three different times between 2011 and 2017. A dependency case was opened from February 24, 2011, to May 13, 2013. A.L. and M.S.A.L. were removed from the parents' care due to father being unable to care for the children because of his mental health issues and mother's substance abuse problem. The parents were provided with reunification services. The court terminated mother's reunification services for failure to comply with the court-ordered case plan. The court returned A.L. and M.S.A.L. to father's custody under a plan of family maintenance. On May 13, 2013, the court terminated jurisdiction and dismissed the case, granting joint legal custody to mother and father and physical custody to father.

A second dependency involving A.L. M.S.A.L. and M.L. was opened from December 2, 2014, to October 28, 2015. The court found true the allegations that both

5

mother and father had a criminal history and unstable lifestyle and a substance abuse history. It also found true that father had mental health issues. The children were returned under family maintenance on or around August 19, 2015. The parents completed all of their services, which included parenting, individual counseling, outpatient parenting, individual counseling, outpatient substance abuse program, testing, and a 12-step program. The case was dismissed and discharged on October 28, 2015.

A third dependency case was opened soon thereafter, from February 19, 2016, to August 3, 2018, due to father's mental health issues, the parents' inability to provide adequate food, clothing, and shelter for the children (minus M.L.L.), and the parents' inability to benefit from previous interventions by CFS. The court ordered the children to be placed in the parents' home under a plan of family maintenance. On August 3, 2018, the court found that the parents had completed the case plan and that CFS supervision was no longer required. The court terminated jurisdiction and dismissed the petition.

On January 14, 2021, the court held a detention hearing in the instant case. Although the recommendation was to remove the children and place them in foster care, the court was impressed that the parents cooperated by appearing at the hearing and bringing the children, so it continued the matter to see if they would continue to cooperate. It ordered them to engage in services, have their home assessed, and drug/alcohol test that day, and the parents agreed. The court continued the matter to January 20, 2021.

On January 20, 2021, the social worker filed a memorandum with additional information for the court, reporting that she went to the PGM's home to assess it and had

6

no concerns about it. A few days later, the social worker went to the parents' home, which they were remodeling. There was a dumpster in the front yard, full of furniture and other items. Two refrigerators were observed in the house, and when father opened the refrigerators, cockroaches were observed coming out. The backyard was observed to be full of trash, appliances, and recyclables. The parents did not allow the social worker to observe the master bedroom or garage, since they stated that the children did not go in there. They said they would continue to stay in the PGM's house until their home was done being "remodeled."

The court held the continued detention hearing on January 20, 2021, and decided to keep the children with the parents, since they were cooperating and following directions. It found the children came within section 300, but decided to detain them with the parents, on the condition that the parents continue to cooperate with CFS and test clean. The court advised the parents that failure to test would be considered a positive test and that they were required to live at a location approved by CFS, which was currently only the PGM's home. The court ordered predisposition services.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on February 17, 2021, recommending that the court find true the allegations that mother had a substance abuse problem and that the parents failed to benefit from prior CFS interventions, but find not true the allegations concerning father's substance abuse and the failure to provide adequately for the children. The social worker recommended the court declare the

children dependents of the court and remain in the parents' custody, under a plan of family maintenance.

The social worker reported that father was present for all of the children's interviews. He informed the social worker that he did not want her to ask the children about drugs or alcohol. She attempted to explain that in order to assess for safety, there were questions that needed to be asked, and he stated his rights were being violated. The social worker further reported that father was randomly tested for drugs/alcohol and tested negative three times in January 2021. The social worker opined that while he had a history of substance abuse, there was not sufficient evidence to support the allegation that he had a current substance abuse issue.

The social worker also reported that the parents were "cooperating very minimally with the department." They did not appear to acknowledge CFS's concern regarding the baby's positive drug test or their prior CFS history. They said they planned to fight all the allegations and stated multiple times that CFS was violating their rights. The parents would not provide the social worker any information regarding their backgrounds. The social worker attempted to interview mother on February 10, 2021, and father was present. In regards to the allegation of substance abuse and testing positive at the birth of M.L.L., mother first stated that she "choose not to answer" but then denied the allegation. When the social worker attempted to gather information about mother's substance use history and how she came to test positive, mother and father would not answer any questions and repeatedly informed the social worker that she was "violating [their] 4th amendment rights." When the social worker asked the parents if they had learned

anything from their previous services, father stated, "We learned how to exercise our parental and constitutional rights."

The social worker stated that the case plan for the parents would consist of continued random and/or on-demand substance testing and a referral to an appropriate substance abuse program, should either of them test positive. Additionally, the parents would need to engage and benefit from general counseling to address the reasons for CFS intervention, and understand the concerns due to M.L.L.'s positive drug screening and prior CFS history. The parents emailed a letter to the social worker stating they were revoking their consent to release information to the department, and stating, "We will not be signing your Service Agreements or Safety Plan based on a 'tip' on your abuse hotline or referral." ·Regarding their children who were of school age, the parents refused to provide the names of the schools they attended.

The court held a jurisdiction/disposition hearing on February 22, 2021, and the parents set the matter contested. It continued the matter but warned the parents: "I maintained the children in your care on the strict condition you fully cooperate with the Department, that includes signing the consents and you should already be in services. If this is still an issue by the time we come back, I'm likely to remove the children. [¶] So you can talk to your counsel about legal advice in that regard but I certainly would suggest you sign those consents sooner rather than later."

On March 8, 2021, the social worker filed a memorandum with additional information for the court. She reported that on February 16, 2021, mother failed to show up for her drug test. Mother said she was feeling sick, and she denied any drug use.

9

Father tested negative on February 17, 2021, and February 26, 2021. On March 4, 2021, another social worker went to the family home to convince the parents to sign the consent form. Father insisted he was not trying to be difficult but said he did not trust CFS. As of the writing of the memorandum, the parents failed to provide a CFS 32 release of information.[3]

The court held a contested jurisdiction/disposition hearing on March 10, 2021, and noted its concern about mother's failure to test, as well as her disregard of the court's specific condition to cooperate and engage in services pending the detention date. Father's counsel objected to the detention of the children and believed father could take care of them adequately. Mother's counsel joined in the comments and added that mother would test that day, sign any forms, and was willing to leave the home. He objected to the lack of facts alleged that the children were at risk and argued that the court did not have jurisdiction to order mother to drug test prior to declaring the children to be dependents. He added that, if the court detained the children, they could still stay with the PGM. The children's counsel asked the court to detain the children "out of sheer caution," since he could not trust what the parents were saying. County counsel agreed that the parents had failed to comply with court orders and asked the court to detain the children.

The court recalled that the recommendation was detention from both parents at the original detention hearing, but it continued the case, did not detain the children, sought a

_____

[3] The CSF 32 is the consent to exchange confidential information/protected health information form.

10

less restrictive placement, and the parties came back to court a week later. The PGM's housing had been assessed and was determined to be appropriate, and the court left the children with the parents "on strict conditions." The court recalled that "[t]he conditions of the detention were to cooperate fully with CFS, to continue to test clean, and to live only in approved CFS location and to allow . . . access." The court also recalled warning the parents that any missed test could result in the removal of the children, and it advised them they were expected to be participating in services by the next date. The court agreed that it did not have authority to order testing prior to jurisdiction but stated it could offer testing "as a means to allow for a safety plan" and did offer it "as a means to allow the children to remain in the home." The court reiterated that it specifically told each parent at the last hearing that it would likely remove the children "if there was any missed tests or if they refused to cooperate with the consent." The court noted that when the social worker went to the home, she did not go into the home, but was outside only. The court added that mother failed to drug test both before and after coming to court in person. The court summed up that there were two missed tests, CFS did not have access to the inside of the home, and the parents were still not signing consent forms. The safety plan and the remedial measures that the court offered to keep the children in the home were not fulfilled; thus, the court found there was prima facie evidence that the children should be removed and there was a current risk of potential drug use in the home.

Additionally, the court found that conditions had changed, continuance in the home of the parents was contrary to the children's best interest, and there was a substantial danger to the physical health and safety and no reasonable means to protect

11

them absent removal. The court ordered, "that we reassess the parents for return on or before the next hearing if they engage in services and continue to test and test clean." It set a pretrial settlement conference and ordered CFS to assess the possibility of return of the children to father with mother out of the home, "based on whether he signs his consents and begins services."

On April 15, 2021, the court held a pretrial settlement conference. Mother's counsel asked if the condition that the parents drug test was actually a condition. The court responded that since they were prejurisdiction, it was technically not an order; however, it would behoove the parents to have clean tests, if they were going to ask for return of the children.

On April 22, 2021, the social worker filed a memorandum with additional information for the court. She reported that the children were placed with the PGM on March 11, 2021, and both parents understood they were not to reside in the PGM's home. The PGM was currently in the RFA (resource family approval) process. The social worker further reported that a CFT (child and family team) meeting was conducted on April 14, 2021, and both parents signed consent forms, but stated they would not participate in any services. They reported the only service they were interested in was "relapse recovery." Father wrote the following statement underneath his signature on the CFS 32 form: "by signing this does not mean I agree to do any service. I'm signing just to show compliance with the court." The social worker also reported that father had been a no-show for random drug/alcohol tests on March 11, 2021, March 22, 2021, and April 5, 2021, while mother was a no-show for drug/alcohol tests on March 2, 2021, March 4,

12

2021, March 15, 2021, April 1, 2021, and April 12, 2021. The social worker stated that the parents had not acknowledged the reasons for CFS involvement or any drug use by mother. Thus, the social worker recommended that the children remain out of the care and custody of the parents and reunification services be provided.

The court held a contested jurisdiction/disposition hearing on April 26, 2021. Mother presented the testimony of her neighbor, Billy S. When asked if he had ever seen father under the influence of alcohol, he said they would drink beer together and get a "buzz." He said they did not hang out on a regular basis. When asked how many beers father had when they did hang out, Billy S. said he saw father consume 40-ounce beers. The testimony and hearing were continued to June 9, 2021.

On June 4, 2021, the social worker filed a memorandum with additional information for the court. She reported that the parents both started individual therapy. She further reported that father was a no-show for testing on April 28, 2021, and tested negative on May 7, 2021, and May 14, 2021. Mother tested negative on May 20, 2021, and was a no-show on May 27, 2021. The social worker inquired about the no-show on May 27, 2021, and mother responded, "I choose not to answer." Additionally, the social worker reported that she spoke with the parents on June 2, 2021, to inquire about the children's schooling information, and father reported the children were homeschooled. When asked what program they were using or if they registered with the local district, he replied, "I choose not to answer." The social worker subsequently discovered three of the children were currently enrolled at Riverside Prep, and one of them was currently enrolled at Columbia Middle School in Adelanto.

13

At the resumed contested hearing on June 9, 2021, the court dismissed the allegations about the parents failing to provide the children with adequate food, clothing, and shelter. Father's counsel called the social worker as a witness and asked if CFS was proceeding with the substance abuse allegation against father. The court said it understood that the children's counsel wanted to proceed with that allegation. Father's counsel also asked her if she was aware from any third parties any allegations that the children were not well cared for because father was allegedly under the influence of illegal drugs, and she said no. Father's counsel also inquired about the allegation against father that he failed to benefit from previous services, and the social worker confirmed that he successfully completed services in the prior dependencies, and the court terminated jurisdiction in those cases. However, she disagreed that father had benefitted from those services, as he was not cooperating, and CFS was not able to work with the family to address mother's substance abuse, father's acknowledgment of her substance abuse, and the risk to the children.

Mother's counsel cross-examined the social worker and asked how she determined the children should be removed from the parents. The social worker said the determination was based on the information that CFS had, the lack of cooperation by the parents, the no-shows, the risk to the children based on the parents' history, and the positive drug test of the baby.

Mother called Dr. Donald Land, a professor, to testify. He was hired by the parents to interpret the "presumptive positive test" dated January 6, 2021, concerning M.L.L.'s meconium sample. He submitted a declaration stating that he reviewed the

14

written lab test result and saw "no evidence that this sample was confirmed by a method to determine specific compounds." He added that the test results were "not a trustworthy basis to establish the presence of amphetamine and methamphetamine in meconium."

Finally, father called as a witness a clinical social worker who started conducting therapy sessions with mother and father approximately five weeks prior. He testified that he had had five sessions with father, and he had no concerns that father was using illegal drugs. He also had no concerns about father's mental health that would impair his ability to care for the children. The social worker also did not suspect mother used any illegal substances or had a drug problem. He testified that mother admitted to having a problem with methamphetamine years ago and said she last used six to seven years prior. The court continued the matter to August 19, 2022.

On August 16, 2021, the social worker requested and reviewed records regarding father's and mother's random drug testing. The social worker received notification that there was no record of either parent attending their random drug testing from June 2021 to August 16, 2021. Regarding their lack of participation, the parents stated they felt the order to drug test "violated their rights due to what they reported, that the original drug test allegation was wrong, and that they should not be required to test."

On August 18, 2021, the social worker filed a memorandum with additional information for the court. The social worker reported that mother was referred to her own therapist on June 10, 2021, and began receiving services on June 30, 2021. The therapist reported that mother refused to speak about her substance abuse and would change the subject when it came up.

15

The court held the continued jurisdiction/disposition hearing on August 19, 2021. Mother's counsel argued there was no evidence mother was showing signs of drug use or that her drug use affected her ability to care for the children. Father's counsel also argued there was insufficient evidence father ever abused drugs. Both parents asked for the allegations to be dismissed. Counsel for the children cited *In re E.E.* (2020) 49 Cal.App.5th 195 (*E.E.*), and argued that the court could look at the evidence as a whole and look at the cooperation of the parents during the investigation phase. Counsel further argued that, like *E.E.*, mother and the baby tested positive, and the parents subsequently did not cooperate with CFS. The children's counsel noted that mother's counsel presented information by an expert that a meconium test had a tendency to be questionable; however, the report by the expert was conducted with insufficient information, since he was not aware of mother's and M.L.L.'s positive urine tests at birth when he did his initial analysis.

County counsel asserted that CFS discovered mother was not homeschooling the children, as she alleged, and the children were not exempt from mandatory school attendance by the school district. County counsel argued that the parents' long CFS history, coupled with their refusal to cooperate with CFS, their refusal to follow the court's orders, and their clear educational neglect of the children, placed the children at clear-and-convincing risk of neglect.

The court dismissed the allegations that mother and father failed to provide the children with adequate food, clothing, and shelter, but sustained the rest of the allegations. The court made clear that it had offered predisposition services, that it could

16

not force the parents to test, but it could consider the lack of cooperation. The court noted that at the beginning of the case, the parents readily agreed to safety plans in order to keep the children in their care, and those safety plans included testing. However, they subsequently failed to sign consents and had multiple no-shows. The court further noted that this was the parents' fourth dependency case since 2011, and the prior removals involved substance abuse.

As to disposition, counsel for the children indicated to the court that the children wanted to return home with the parents. However, he, as their attorney, was not in agreement with the children, particularly because the parents continued to deny mother's substance abuse, despite the evidence of the positive test results at M.L.L.'s birth. He agreed that reunification services were appropriate. The court found that continuance in the home of the parents was contrary to the children's welfare, and there was a substantial danger to the physical, health and safety and no reasonable means protect the children, absent the removal. The court noted that "we did try reasonable means to allow the children to remain in the home and despite indicating a willingness to agree to a safety plan, the parents were not cooperative." The court declared the children dependents, removed them from the custody of the parents, and ordered reunification services.

DISCUSSION

I. There Was Sufficient Evidence to Support the Court's Jurisdiction Order

Mother argues the evidence was insufficient to support the court's jurisdiction over the children since there was no evidence or finding of harm as a result of her alleged substance abuse. She asserts that the only evidence of her drug use affecting her ability

17

to care for the children was a positive drug test at delivery. Mother contends that, other than the one positive test and her history of drug abuse, CFS failed to provide evidence of substance abuse at the time of the jurisdiction/disposition hearing. Respondent contends there was sufficient evidence that mother had a substance abuse problem, which placed the children at risk of neglect and/or abuse. We agree with respondent.

A. *Applicable Law and Standard of Review*

" 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645.) "Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the 'child has suffered, *or there is a substantial risk that the child will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . .' (Italics added.) 'A jurisdictional finding under section 300, subdivision (b)(1), requires [the agency] to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness.' " (*E.E.*, *supra*, 49 Cal.App.5th at p. 205.)

"Second, if the court exercises jurisdiction over the minor, it must decide the appropriate disposition. Generally, the court chooses between allowing the child to remain in the home with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification. 'Removal from

18

parental custody at disposition may be ordered where a return home would pose a substantial danger to the child's physical health and where there are no reasonable alternatives to removal. [Citation.]' [Citation] The burden of proof for jurisdictional findings is preponderance of the evidence; for removal, it is clear and convincing evidence." (*E.E.*, *supra*, 49 Cal.App.5th at pp. 205-206.)

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

B. *The Evidence Was Sufficient*

Relying on *In re Drake M.* (2012) 211 Cal.App.4th 754, 766 (*Drake M.*), mother specifically contends that, "[w]ithout a showing on the record of evidence of a specific, defined risk of harm to a child resulting from a parent's drug use, such harm that could come to pass is merely speculative."[4]  However, we note that the focus of section 300 is

---

[4] Mother cites the portion of *Drake M.*, *supra*, 211 Cal.App.4th 754, which states that a finding of substance abuse for purposes of section 300, subdivision (b), must be based on evidence sufficient to show the parent has been diagnosed with a current

*[footnote continued on next page]*

on averting harm to the child, and "[t]he juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm from the parent's negligent conduct." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.) "[E]vidence of past conduct may be probative of current conditions." (*Ibid.*) Furthermore, as the *Drake* court recognized, "[t]he trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*Drake M.*, *supra*, 211 Cal.App.4th at p. 766.)

In *E.E.*, *supra*, 49 Cal.App.5th 195, a mother tested positive for amphetamine during a prenatal appointment, and her newborn tested positive for amphetamine and marijuana at birth. (*Id.* at p. 198.) The mother had three other children and argued there was no evidence that they had been harmed or were at risk of harm at the time of the jurisdiction hearing. She contended there was no evidence she was "a substance *abuser* and argue[d] her past use of drugs [was] an insufficient reason to assert jurisdiction over [the child's] siblings." (*Id.* at p. 212.) This court rejected her arguments, first noting that section 300 does not require that a child actually be neglected before a juvenile court can assume jurisdiction, but only requires there be a substantial

---

substance abuse problem by a medical professional or fits the clinical definition in the Diagnostic and Statistical Manual of Mental Disorders. To the extent she may be arguing such diagnosis was required, we disagree. "The *Drake M.* formulation 'is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court, and we are unwilling to accept [the] argument that only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser.' " (*In re K.B.* (2021) 59 Cal.App.5th 593, 601 (*K.B.*).)

risk of neglect. (*Ibid.*) We found that substantial evidence supported jurisdiction where the mother used drugs at least three times during her pregnancy, was evasive and resisted investigation and help from CFS, "never actually admitted using amphetamine while pregnant and consistently maintained an implausible story of accidental ingestion to explain the second positive amphetamine test." (*Id.* at p. 213.) This court noted that the mother "avoided or missed several drug tests and, at the time of the hearing, had not seriously begun any services to address her issues." (*Ibid.*) We further concluded that, "given [the] mother's implausible denial of the extent of her drug use while pregnant, her evasive behavior, and her resistance to monitoring and services, the juvenile court could reasonably disbelieve her offer of proof that she was no longer using." (*Id.* at p. 214.)

The facts in the instant case are analogous to *E.E.* When initially asked about her positive drug test at M.L.L.'s birth, mother said she did not know how she could have tested positive for any drugs. She stated that she last used drugs in 2011. She further claimed she was "stereotyped" by the hospital staff. Mother could not give a reason as to why she tested positive and continuously denied any current drug use. When asked again the next day, mother said she did not use drugs before having the baby. When asked about how she tested positive for amphetamines, she told the social worker it "could have been the Halloween candy" or "falling when '[she] was sitting.' " A month later, when the social worker asked about her substance abuse and positive test, mother first said she "choose not to answer" and then denied the allegation. Mother then said she would not answer any questions and repeatedly said the social worker was "violating [her] 4th amendment rights."

21

Furthermore, the record showed that mother had a long history of substance abuse and an extensive dependency history. The first dependency case was opened from February 24, 2011, to May 13, 2013, when two of the children were removed due in part to mother's substance abuse problem. Mother was provided with reunification services, but they were terminated for failure to comply with the case plan. The second dependency involving three of the children was opened from December 2, 2014, to October 28, 2015, again due in part to mother's substance abuse history. This time mother completed her services, which included an outpatient substance abuse program, testing, and a 12-step program. The third case just a few months later in February 2016, due in part to the parents' inability to provide adequate food, clothing, and shelter for the children and the parents' inability to benefit from previous interventions by CFS. The court ordered the children to be placed in the parents' home under a plan of family maintenance and eventually terminated jurisdiction.

Mother did admit she had a history of drug use; however, she gave different answers as to when she stopped using. She initially said she last used in 2011. She then reported she last used drugs a year and a half prior to M.L.L.'s birth. When she started individual counseling, she told her counselor she last had a problem with drugs six or seven years prior. We further note that when she started seeing another therapist on June 30, 2021, mother refused to speak about her substance abuse and would change the subject when it came up.

In any event, despite having completed prior substance abuse treatment, mother relapsed as shown by her positive test at M.L.L.'s birth. She denied the allegation of the

positive test and attempted to rationalize her positive test with nonsensical explanations. More importantly, mother refused to participate in predisposition testing, even though she agreed to participate in drug testing and was explicitly warned that a failure to test would be considered a positive test. Mother had multiple no-shows and refused to drug test during the period from June 2021 to August 16, 2021.[5] Mother and father reported that they felt the order to drug test violated their rights, that the original drug test allegation was wrong, and that they should not be required to test.

In addition, despite agreeing to cooperate with CFS, mother refused to sign the consents to release information to the department or the safety plan for months. Although the parents signed the consent forms on April 14, 2021, they reported that they would not participate in any services, except perhaps "relapse recovery." Furthermore, the parents refused to provide the names of the schools the children attended. Father then reported the children were homeschooled. However, the social worker later discovered the children were actually enrolled in school.

Given mother's implausible explanations of why she tested positive at M.L.L.'s birth, her inconsistent answers with regard to her substance abuse history, her refusal to

---

[5] In her reply brief, mother asserts that, while she did agree to predisposition services, those were only to last to the disposition hearing scheduled for February 22, 2021. She argues that it is baseless for respondent to accuse her of not following the court's orders, since "she did test to the date the Dispo was to be heard, but didn't continue testing after the dispo was continued over and over again." We note the record does not appear to show she drug tested before February 22, 2021. However, it does show she failed to appear for her drug test on February 16, 2021. It also reflects that, at that time, the parents had revoked their consent to release information and stated they would not sign the service agreement or safety plan. Moreover, at the hearing on February 22, 2021, the court noted the parents' lack of cooperation was an issue.

23

participate in drug testing and services, and her lack of cooperation with CFS, the juvenile court could reasonably conclude that she was still using drugs and reasonably disbelieve her assertions to the contrary. (See *E.E.*, *supra*, 49 Cal.App.5th at p. 214.) Furthermore, mother had an extensive history of substance abuse and still failed to appreciate the serious consequences of using drugs, as the tests indicated she used methamphetamine when she was pregnant with M.L.L. Mother denied having a current problem and took no apparent steps to address her use, and in fact refused to speak about her substance abuse with her latest therapist. " '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' " (*In re A.F.* (2016) 3 Cal.App.5th 283, 293; see *K.B.*, *supra*, 59 Cal.App.5th at p. 604 ["A court is entitled to infer past conduct will continue where the parent denies there is a problem."].) We also note the parents' evasive answers about the children's schooling—at first, refusing to give the names of their schools, then stating the children were homeschooled. Issues with schooling could indicate a lack of supervision. (See *K.B.*, at p. 603.) All of these factors combined supported the court's finding that the children were at risk of suffering harm and/or neglect.

Viewing the evidence in the light most favorable to the court's determinations, as we must, we conclude the court properly took jurisdiction of the children. (*R.T.*, *supra*, 3 Cal.5th at p. 633.)

II. <u>There Was Sufficient Evidence to Support the Court's Removal of the Children</u>

Mother argues there was insufficient evidence to meet the heightened standard of clear and convincing evidence to support the court's removal of the children from her

24

custody, pursuant to section 361, subdivision (c)(1). She claims the evidence of the one positive test and her history did not support a finding that the children faced a "substantial danger" to their health and safety. Moreover, it did not show that removal was the only reasonable means by which the children's physical health could be protected. She points out that there were no problems when the children lived with the parents at the PGM's home.[6] We conclude the evidence was sufficient to justify removal of the children.

As the court stated, "we did try reasonable means to allow the children to remain in the home and despite indicating a willingness to agree to a safety plan, the parents were not cooperative." (See *ante*, § I.) Mother's resistant behavior and lack of progress in services reflected a desire to avoid investigation into the extent of her drug use and a lack of insight into the serious problems parental drug use poses. (*E.E.*, *supra*, 49 Cal.App.5th at p. 217.) Furthermore, there was no indication that the parents had cleaned up or improved the living conditions of their home. Based on the evidence, the juvenile court could reasonably infer that mother lived in an environment unsuitable for children, that she would not cooperate with CFS, and that she would not protect the children from her drug problem. These inferences support a conclusion that the children could not safely be returned to mother's custody. (*E.E.*, at pp. 215-216.)

---

[6] Mother argues the children "could have successfully remained home" and they did not face substantial danger to their health and safety in her custody. She does not appear to suggest staying with her in the PGM's home.

25

We note mother's claim in her reply brief that the children could have remained home, subject to CFS's stringent supervision and unannounced visits, the court's continued oversight, and her "consistent compliance with the reunification case plan." However, we disagree, in light of her consistent noncompliance with the prejurisdiction safety plan. (See *ante*.)

To the extent father joins in mother's opening and reply briefs as it inures to his benefit, we also affirm the court's jurisdiction and disposition orders.

### III. We Need Not Address Father's Claims

Father argues that the juvenile court's jurisdiction finding and order based upon his alleged substance abuse, as well as the court's disposition order, were not supported by sufficient evidence. He further claims the children could have remained with him in the PGM's home, "subject to CFS's 'stringent' supervision and unannounced visits, the juvenile court's continued oversight, father's consistent compliance with the court's family maintenance case plan, and, if necessary, mother's relocation."[7]

"The purpose of dependency proceedings is to protect children. [Citation.] Dependency proceedings are civil in nature and are designed to protect the child, not to punish the parent. [Citation.] Therefore, the court takes jurisdiction over children (§ 300); it does not take jurisdiction over parents. Moreover, the court has jurisdiction over the children if the actions of *either* parent bring the child within one of the statutory

---

[7] We note that, at the jurisdiction/disposition hearing, father stated he simply "wants his children back today." He did not suggest staying with the PGM or placing the children with him under family maintenance.

26

definitions in section 300." (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 202, italics added.) In other words, "it is necessary only for the court to find that *one* parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491, italics added.) "For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence." (*Id.* at p. 1492; see *E.E.*, *supra*, 49 Cal.App.5th at p. 212 [court did not need to review evidentiary basis for sustained allegations against the father since it concluded jurisdiction was proper based on the mother's conduct].) In light of our conclusion that the court properly took jurisdiction over the children due to mother's conduct, we decline to address father's claims regarding jurisdiction. As to his claim regarding the court's removal of the children from his custody, we conclude removal was proper for the reasons discussed *ante*, including his failure to show any concern about mother's or M.L.L.'s positive drug tests at birth, his resistant behavior and interference with the interviews of the children, and his minimal cooperation with CFS. (See *ante*, § I.) This evidence, coupled with evidence of father's multiple failures to submit to drug testing in the face of apparent ongoing alcohol use and the unsanitary conditions in the parents' home constitutes substantial evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor[s] if the minor[s] were returned home, and there are no reasonable means by which the minor[s'] physical health can be protected without removing the minor[s] from the minor[s'] parent's . . . physical custody." (§ 361, subd. (c)(1).) We conclude the

27

juvenile court reasonably tried to permit the children to remain with the parents but was unable to safely do so due to the lack of cooperation.

To the extent mother joins in father's reply brief, we also affirm the court's jurisdiction and disposition orders.

<u>DISPOSITION</u>

We affirm the juvenile court's jurisdictional and dispositional findings and orders.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS
             J.


We concur:

McKINSTER
   Acting P. J.

MILLER
    J.