221 Cal.App.3d 629 (1990)
271 Cal. Rptr. 319
In re STEPHEN W., a Person Coming Under the Juvenile Court Law.
BUTTE COUNTY CHILD PROTECTIVE SERVICES, Plaintiff and Respondent,
v.
RAYLA W., Defendant and Appellant.
Docket No. C006249.
Court of Appeals of California, Third District.
May 25, 1990.
*634 COUNSEL
Judith Rosen, under appointment by the Court of Appeal, Lucy Quacinella, Michael R. Bush, Ray L. Fuller, Andrew T. Holcombe, Alan Lieberman, Paul T. Persons and Joan Bertin for Defendant and Appellant.
Catherine I. Hanson, Alice P. Mead and Robert Roth as Amici Curiae on behalf of Defendant and Appellant.
Susan Roff Minasian, County Counsel, and David W. Kennedy for Plaintiff and Respondent.
OPINION
PUGLIA, P.J.
Stephen W. was declared a dependent child of the juvenile court under former section 300, subdivision (a) (Stats. 1986, ch. 1122, § 2, repealed by Stats. 1987, ch. 1485, § 3, operative Jan. 1, 1989) and section 300, subdivisions (a) and (b) of the Welfare and Institutions Code. (Stats. 1987, ch. 1485, § 4, operative Jan. 1, 1989.)[1] (All statutory references to sections of an undesignated code are to the Welfare and Institutions Code.) The court sustained a petition which alleged that Stephen was born under the influence of opiates, that Stephen's parents have a long-standing substance abuse problem, and that they are incapable of providing for Stephen's care, custody and control. Stephen was placed with his paternal grandparents pending successful completion by his parents of a family reunification plan. Rayla W., Stephen's mother, appeals. We shall affirm.
Stephen was born on November 27, 1988. Shortly after his birth, Stephen displayed symptoms consistent with drug withdrawal. Testing revealed opiates in Stephen's urine. He was treated medically for his withdrawal symptoms. The matter was referred to Butte County Child Protective Services (CPS). The mother admitted she was a heroin addict and had taken heroin as recently as the day prior to Stephen's birth.
*635 On November 28 Stephen was taken into temporary custody pursuant to section 305. Two days later, November 30, CPS filed a petition alleging under subdivisions (a) and (d) of former section 300 that Stephen's parents were "unable/unwilling" to provide for his care, custody and control due to their "longstanding substance abuse problem that periodically renders them incapable" of providing such care.[2] On that same day Stephen was released from the hospital and placed in temporary foster care pending placement with a relative. On December 2, Stephen was placed with his paternal grandparents.
A contested detention hearing set for December 8 was continued to allow the court to address the mother's motion to dismiss the petition. On December 9, the court heard the mother's motion wherein she argued, in essence, that by basing the petition on Stephen's status at birth, CPS was attempting to create rights in the fetus enforceable against the mother. In addition, the mother claimed CPS was attempting to "penalize individuals on the basis of their status as addicts." The trial court treated the motion to dismiss as a demurrer and following hearing, argument and briefing, concluded the allegation the parents are unable properly to provide care for Stephen as a result of longstanding substance abuse was sufficient to state a cause of action. The court denied the motion.
The matter was continued to December 14 for a contested detention and jurisdictional hearing. At that hearing, the trial court received evidence that both parents, Rayla W. and Leonard W., were addicted to heroin. The trial court ruled the initial detention of Stephen was necessary and "[b]ased on the evidence before the Court," found Stephen to be within the provisions of former section 300, subdivision (a).[3] The court ordered that both parents *636 submit to drug testing to "prove they remain drug free until the [dispositional] hearing" which the court set for January 6, 1989. In so directing, the court indicated that if by the time of the dispositional hearing it received evidence the parents had abstained from narcotics for two weeks, it would consider returning Stephen to the custody of his parents.[4]
The dispositional hearing was ultimately held on January 13. At that hearing the court noted it had received and read the report and recommendation of CPS which indicated that while the parents had completed the 21-day detoxification program, neither parent was able to provide drug-free tests.[5] An addendum to the dispositional report noted the parents failed to appear for testing on January 1, 1989, and the mother missed another test on January 4, 1989.[6] A second addendum to the dispositional report noted the parents were again unable to provide drug-free tests and that Stephen's father failed to appear for testing on January 6, 8, and 10. At the conclusion of the hearing the court commented: "Now the Court certainly recognizes without any question I've been given evidence that [the parents] have not, quote, passed the tests. [¶] I don't pretend to be any medical expert but I will, I think, safely assume that probably the kind of addiction suffered by [the parents] is as serious as it can get...." As a result, the court reiterated its finding of jurisdiction under former section 300, subdivision (a) and found jurisdiction under present section 300, subdivisions (a) and (b).[7] The court declared Stephen to be a dependent child of the juvenile *637 court, placed him with his paternal grandparents under supervision of CPS, ordered services and programs pursuant to section 362, and placed Stephen in the family reunification program to facilitate his return home following placement.[8] The mother's appeal followed.[9]

I
The mother makes numerous claims with regard to her assertion the trial court erred in denying her motion to dismiss the petition. (1a) Mother first argues the petition was deficient in failing to contain a concise, separate statement of facts in support of the allegation Stephen was within the jurisdiction of the juvenile court.[10]
The petition alleged in relevant part: "The minor comes within Section(s) 300(a) and (d) of the 1988 California Welfare and Institutions Code in that the minor's parents are unable/unwilling to adequately provide for the care, custody and control of the minor due to the minor's parents' longstanding substance abuse problem that periodically renders them incapable of providing for the minor's care, custody and control."
The factual allegations in support of the petition were: "a. On or about November 27, 1988, following the minor's birth, the minor was found to have opiates in his urine. [¶] b. Following the minor's birth, the minor displayed behaviors consistent with opiate drug withdrawal and symptoms which were medically treated."
Mother claims these factual allegations actually arraign her for conduct prior to Stephen's birth and as such cannot support a dependency petition under section 300. (See In re Steven S. (1981) 126 Cal. App.3d 23, 26-30 [178 Cal. Rptr. 525].) Mother claims that when the petition is stripped of these factual allegations, all that remains is the bare statutory language which does not satisfy the requirement of a concise, separate statement of *638 facts in support of the petition. (§ 332, subd. (f); In re Jeremy C. (1980) 109 Cal. App.3d 384, 397 [167 Cal. Rptr. 283].) We disagree.
The petition alleges the facts known to CPS at the time it was filed. These facts concisely describe Stephen's medical condition at birth, and particularly that he suffered withdrawal as a result of what appeared to be the mother's use of opiates during pregnancy.
As we view the issue, the question is not whether the factual allegations in support of the petition formally satisfy the requirements of section 332, subdivision (f), because clearly they do. Rather, the question is whether the facts alleged are legally sufficient to state a cause of action to declare a child a dependent of the juvenile court. We answer this question in the affirmative.
In re Troy D. (1989) 215 Cal. App.3d 889 [263 Cal. Rptr. 869] is precisely on point. Troy was born under the influence of morphine, methamphetamine and amphetamine. A petition was filed alleging Troy came within the provisions of section 300, subdivision (a) in that he "`was diagnosed as being born under the influence of a narcotic and/or dangerous drugs ... the parents were unable to protect said minor, and the minor is in need of the protection of the Juvenile Court.'" (At p. 895.) Troy's mother demurred to the petition, arguing that even if there were sufficient admissible evidence to sustain the allegation Troy was born under the influence of dangerous drugs, such fact would be an insufficient legal basis for juvenile court jurisdiction.
The Troy D. court disagreed: "The fact that Troy was diagnosed as being born under the influence of a dangerous drug is legally sufficient for the juvenile court to exercise jurisdiction. Section 355.1(a) provides: `Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by the minor of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care and custody of the minor, that evidence shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300.'" (215 Cal. App.3d at p. 897.) The court continued: "Troy was born with a detrimental condition caused by Mother's unreasonable acts of ingesting dangerous drugs while pregnant with him. This fact created a legal presumption that he is a person described by section 300(a)." (At p. 897.)
Mother argues the Troy D. court erroneously considered evidentiary matters in upholding the legal sufficiency of the petition on its face to state a *639 cause of action under section 300. (215 Cal. App.3d at p. 897.) Nevertheless, we believe the Troy D. court's conclusion is correct. (2) A minor is prima facie within the provisions of section 300, subdivision (a) where it is shown by competent professional evidence the minor has sustained an injury of "such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts" of the parent (§ 355.1, subd. (a)). For pleading purposes, the allegation of such facts is sufficient to withstand a challenge to the legal sufficiency of the petition.
(1b) Stephen was born with opiates in his urine and displayed symptoms of drug withdrawal shortly after birth so that it was necessary medically to treat his withdrawal symptoms. These allegations are sufficient to support a dependency proceeding to determine if a minor is within the provisions of section 300, subdivision (a). (In re Troy D., supra, 215 Cal. App.3d at p. 897.)
Mother cites In re Jeannette S. (1979) 94 Cal. App.3d 52, 59, footnote 2 [156 Cal. Rptr. 262], for the proposition that a showing of substance abuse, standing alone, is insufficient to support a finding of dependency. Here, however, the allegation of substance abuse was coupled with an allegation of actual injury to the minor.
(3) Mother claims that by basing the petition on acts occurring during pregnancy, CPS was attempting to create rights in the fetus enforceable against the mother. A similar contention was raised and rejected in Troy D: "Mother argues that it is improper to sustain jurisdiction on the basis of the petition because it involves conduct with respect to a fetus, not with respect to a child. We disagree with this argument. [¶] Although, as Mother points out, a dependency petition cannot be sustained with respect to a fetus (In re Steven S. (1981) 126 Cal. App.3d 23 [178 Cal. Rptr. 525]), Troy is not a fetus but a living child born with dangerous drugs in his body because his mother used the drugs while pregnant with him. The petition was concerned with the protection of a living child, not with a fetus as in the case of Steven S. ... [¶] We agree that prenatal use of dangerous drugs by a mother is probative of future child neglect. As the trial court said in overruling the demurrer, `the care of a minor to me includes anticipatory actions,' and `[the petition] indicates that the mother conducted herself in a manner that was dangerous to the child prior to the child's birth but with full knowledge the child would be born.' Mother's prenatal drug use indicated that Troy was at risk and in need of the court's protection. [¶] While jurisdiction must be asserted on the basis of conditions which exist at the time of the jurisdictional hearing, the court is not required to disregard the mother's prior conduct. [Citation.] `[P]ast events can aid in a determination of present unfitness.' [Citation.] Although we recognize that the [cited] cases ... deal *640 with prior conduct with a living child, rather than a fetus, we believe the same reasoning is applicable. Mother's conduct prior to Troy's birth was sufficient to establish the court's jurisdiction." (215 Cal. App.3d at pp. 897-900.) We agree with the reasoned analysis in Troy D.
(4a) Mother asserts the petition failed to satisfy due process demands under both the state and federal Constitutions in that she was not provided with adequate notice of the charges against her. Mother argues that throughout the proceedings she has never denied she had a drug problem. She claims, however, that the bald assertion in the petition that she had this problem did not inform her how her drug use affected her ability to parent and how she could defend herself against the charges. The argument is specious.
(5) "Fundamental to due process is the right to notice of the allegations upon which the deprivation of custody is predicated, and to notice of the time and place of the hearing. In other words, a parent is entitled to be apprised of the charges he must meet in order to prepare his case, and he must be given an opportunity to be heard and to cross-examine his accusers." (In re Neal D. (1972) 23 Cal. App.3d 1045, 1048 [100 Cal. Rptr. 706], disapproved on other grounds in In re B.G. (1974) 11 Cal.3d 679, 691-692 [114 Cal. Rptr. 444, 523 P.2d 244].)
The courts have phrased the question as whether the parent was provided meaningful notice of the charges (see In re J.T. (1974) 40 Cal. App.3d 633, 639 [115 Cal. Rptr. 553]). (4b) As so formulated, that standard is satisfied in this case. The petition alleged that neither parent was able adequately to provide for the care and control of the minor due to their longstanding substance abuse problem that periodically renders them incapable of providing such care. This was followed by specific factual allegations that at birth Stephen had opiates in his urine and displayed symptoms of opiate drug withdrawal leading to the unmistakable implication that Stephen was born addicted to opiates. The petition and supporting allegations provided clear notice the proceedings would examine whether the mother had a substance abuse problem and, if so, whether that addiction would in any way prevent her from exercising care and control of the minor.
(6) Finally, both mother and amicus curiae argue the petition violates due process because it singles out parents based solely on their status as substance abusers. Mother asserts "[s]uch petition places moral blame on the status of drug users without any factual showing of the inability to parent." Mother further argues "[i]f a dependency petition could be filed on the basis of substance abuse alone, then parents could be singled out for *641 potential termination of their fundamental rights based solely on their status without any inquiry into functional abilities. This would create a conclusive presumption of unfitness."
In support of her claims, mother cites Stanley v. Illinois (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208], which involved a state law denying child custody to unmarried fathers. In finding that law unconstitutional, the Stanley court held: "It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children.... [¶] Procedure by presumption is always cheaper and easier than individual determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." (Fns. omitted; id. at pp. 654-657 [31 L.Ed.2d at pp. 560-562].)
In raising the specter of "a conclusive presumption of unfitness," mother erects a strawman. Unlike the father in Stanley, here mother was clearly entitled to, and did, present evidence at the jurisdictional and dispositional hearings in an attempt to demonstrate that despite her admitted addiction she could adequately care for Stephen. Obviously, the mere filing of the petition did not create a presumption, either conclusive or rebuttable, that mother was unfit to care for the minor. The petition simply tendered the issue before the juvenile court of mother's ability to care for Stephen. The focus there was, as it should be, on the best interests of the minor. If that inquiry is triggered by or calls into question the issue of parental substance abuse, so be it. We reject mother's argument to the effect that the right of pregnant addicts to abuse drugs requires society to turn a blind eye to the plight of addicted newborns.
We also reject mother's argument because there is nothing in the record to suggest she was singled out solely because she was a substance abuser. Rather, the record indicates the petition was filed because CPS believed there was a child at substantial risk for a number of reasons, including the fact both parents were admitted drug addicts, and the child was born addicted to opiates and required medication to relieve his withdrawal symptoms. In our view, CPS would have been remiss in its responsibilities if, when such facts came to its attention, it had not filed a petition seeking a hearing in the juvenile court to evaluate in light of all the circumstances whether there was in fact a parent willing and able to exercise care and control over Stephen.

*642 II
(7a) Mother argues the evidence was insufficient to justify sustaining the petition. Mother claims the evidence showed, inter alia, she is a proven "good parent," she made substantial efforts to prepare for the new baby by acquiring clothes and furniture, she sought methadone treatment during pregnancy and following Stephen's birth, she reenrolled in a treatment program. Mother's attempt to reargue the evidence founders on the substantial evidence standard by which this court is bound.
(8) "With rhythmic regularity, it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is any substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." (Italics in original; Overton v. Vita-Food Corp. (1949) 94 Cal. App.2d 367, 370 [210 P.2d 757], disapproved on other grounds in Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal. Rptr. 767, 402 P.2d 839].)
(7b) Over the two-day detention and jurisdictional hearing, the trial court received uncontradicted evidence that mother was a heroin addict and had ingested heroin on the day prior to Stephen's birth. The evidence established Stephen was born with opiates in his system and was suffering from withdrawal symptoms; specifically, "fine tremors of the arms and legs." Doctor DeMetry, the attending pediatrician, testified that such "jitters" or "tremors" are the first sign of withdrawal from substance addiction. Doctor Pagano, the attending obstetrician, testified Stephen "was suffering from intrauterine growth retardation," his general appearance at birth "was not good," and his low birth weight was cause for concern. Based on the prenatal history, Pagano was concerned about Stephen's health and concluded that he would be "worried about the future." These facts, standing alone, presented a prima facie case for dependency jurisdiction within the provisions of section 300, subdivision (a). (In re Troy D., supra, 215 Cal. App.3d at pp. 903-905.)
Additional evidence was presented supporting the trial court's finding that mother was not capable of caring for the needs of her newborn child. Joyce Quaytman, a licensed psychotherapist and marriage and family counselor, testified that in her opinion parents addicted to heroin should not have the responsibilities of caring for a newborn infant until there is a treatment program established and the parents are recovering from addiction. In response to a request by the trial court to explain why such parents *643 might be unable to care for a newborn infant, Quaytman testified: "Basically there are many, many factors involved. One is the cycle of the addiction. The pharmacological structure of heroin specifically displays a pattern wherein when the client doses on heroin they first of all get what we call a rush, or what many describe as a euphoria. The euphoria is followed very quickly with a stupor, or sleepiness, what we used to call `nodding off,' and with very little control over those kinds of factors. [¶] [T]herefore, their ability to pay attention especially to the needs of a newborn which change quite rapidly would not be solid there. There would be times when they would not able to attend to those needs. They would nod off, be asleep or be in a stupor for maybe hours at a time. [¶] Also, in couples who use heroin together or who use opiates together, frequently they use them at the same time. It's a way of connecting with each other, if you will, and that means that both parents would be out of commission frequently at the same time."
Quaytman also noted that other factors were involved, particularly the machinations required to obtain heroin. She testified "[c]onnections frequently dry up and they frequently have problems with them. They're often secretive, and it's difficult to obtain the heroin, so therefore there would be an unstable lifestyle surrounding the procuring of the illicit drugs. That's a second factor. [¶] The third factor that is at risk is the quality of the drug itself, what it's cut with, what the supply is at any given time. If the source changes or in any way alters the usual type of heroin dosage that the individual is getting, if the substance is cut with anything different there's a potential risk of overdose or other kinds of side effects."
Quaytman opined the effects of parental addiction interfere with the child's emotional development, interrupting the "bonding" process. She also testified a parent's desire for heroin has a substantial effect on the ability of the parent to give priority to the child's needs: "[I]f there is a great length of time between being able to procure the drug, the erratic behavior of the addict increases. The ability to concentrate or focus on the needs of the child and to prioritize those literally disappears as the length of time between the last dosage and what is currently needed by the individual increases."
Finally, Quaytman testified that in her opinion a parent must be free of heroin for at least three months before undertaking the responsibility of caring for an infant.
Mother claims Quaytman's testimony rested on the incorrect assumption that mother was continuing to use heroin. Mother argues the evidence showed that at the time of the jurisdictional hearing she was enrolled in a methadone detoxification program. Yet, there was no competent evidence *644 presented that mother was no longer using heroin. The mere fact she subsequently enrolled in a detoxification program is far from compelling evidence that her use of heroin had ceased.
Faced with the evidence of the parents' admitted heroin addiction, the fact Stephen was born suffering from such addiction, and Quaytman's testimony as to the effect a drug such as heroin has on a person and whether that person can exercise care and control of an infant when using such drug, the burden was clearly shifted to the mother to establish that despite her admitted drug use, she could care for the child. That the mother's evidence failed so to convince the juvenile court provides this court with no warrant to interfere with that court's decision finding jurisdiction under the provisions of section 300, subdivision (a).[11]
Mother claims "evidence that [she] was a recovering heroin addict and currently enrolled in a methadone program was an insufficient basis to declare jurisdiction over the newborn ... under section 300." But there is no support for the assertion the juvenile court based its jurisdictional finding on mother's status as a "recovering heroin addict." To the contrary, the juvenile court found "convincing evidence [the parents] are addicted to heroin and has no evidence that that addiction has been cured at this time or [that they are] not taking heroin today."
(9) (See fn. 12.) The record contains substantial evidence to support the juvenile court's sustaining of the jurisdictional allegations contained in the petition.[12]

III
(10a) Finally, mother contends the juvenile court at the dispositional phase failed to make the required findings and conclusions required by section 361, subdivision (b). She also asserts that if such findings and conclusions were made, they are not supported by clear and convincing evidence. Finally, she claims there was no evidence of reasonable efforts by CPS to maintain the integrity of the family unit as required by statute. (§ 361, subd. (c).) These claims must be rejected.
*645 (11) "A dependency proceeding under section 300 is essentially a bifurcated proceeding." (In re Jamie M. (1982) 134 Cal. App.3d 530, 535 [184 Cal. Rptr. 778].) First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction. (Ibid.) If jurisdiction is found, a decision must be made as to the appropriate disposition for the child. (Ibid.) Removal from parental custody at disposition may be ordered where a return home would pose a substantial danger to the child's physical health and where there are no reasonable alternatives to removal. (§ 361, subd. (b)(1).) In addition, subdivision (c) of section 361 requires a finding of reasonable efforts to prevent or eliminate the need for removal. The statute mandates "[t]he court shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (c).)
(10b) Contrary to mother's claims, the trial court adequately expressed its findings and conclusions consistent with the statutory mandate. As the record indicates, the court made its findings by clear and convincing evidence  the standard used at the dispositional phase (§ 361, subd. (b))  "that the parents are addicts and when under the influence of narcotics are not able to care for the child and thus render the child susceptible to serious harm, especially at its age." It is true the court misspoke in referring to such facts as its "jurisdictional" finding, but a reading of the entire record convinces us the court was well aware of its responsibilities at the dispositional phase and the findings and conclusions made discharged those responsibilities.
We likewise reject mother's argument the above cited findings and conclusions are unsupported by the evidence, and particularly mother's claim the record contains no evidence to show her drug problem has ever resulted in neglect or harm to Stephen. While mother may have a cavalier attitude about Stephen's low birth weight, tremors and retarded intrauterine growth, Stephen's condition was of tremendous concern to Doctor Pagano and certainly supports the court's dispositional findings.
Mother next claims that even if Quaytman's generalizations about heroin addicts were sufficient to provide jurisdiction over Stephen, such testimony was an insufficient basis upon which to remove him from the home. Noting that Quaytman had little or no information about mother's history or current addiction, mother asserts testimony in general about how heroin can affect the ability to parent is not sufficient to establish specific harm or substantial danger to the minor.
We are unconvinced. If mother wished to distance herself from any of the "generalizations" about heroin addicts as testified to by Quaytman  specifically, *646 that heroin users are prone to "nod off" for substantial periods of time, that heroin addicts engage in criminal activities to support their habits, that the need for a regular fix may divert the attention of an addict away from other matters, such as caring for the needs of an infant child, etc.  mother could have taken the stand and so testified. By electing to remain silent, mother left the court faced squarely with the question whether to accept or reject Quaytman's testimony. Obviously, the court found Quaytman persuasive and credible, and this court has neither the power nor the desire to reweigh the evidence in mother's favor.
Finally, mother claims the record fails to support a finding that there was no reasonable alternative to removal or that reasonable efforts were made to prevent or eliminate the need for removal as required by section 361, subdivision (c). We disagree. At the detention and jurisdictional hearings, Jo Hines, a CPS social worker, testified she explored the possibility of nondetained petition, of voluntary placement or voluntary services with staff supervision, considered all assessment issues and finally concluded the best interest of the minor would be served by detention. At the conclusion of the hearing, the court stated its belief the only services that could have been offered to avoid danger to the minor would be "to put somebody in [the parents'] home 24 hours a day." (12) (See fn. 13.) At the dispositional hearing evidence was presented that the mother had failed four drug tests and missed two other tests.[13] (10c) In addition, mother's own witness testified the possibility of a relapse would not be "unusual." Faced with such evidence, there was no reason for the juvenile court to depart from its earlier finding that no services short of 24-hour in-home supervision could assure Stephen was receiving appropriate care. In light of the entire record, we deem the finding that removal was the only reasonable alternative and that reasonable efforts were considered to keep the family unit intact supported by the evidence.
The judgment is affirmed.
Marler, J., and Davis, J., concurred.
NOTES
[1] Until January 1, 1989, the juvenile court had jurisdiction under subdivision (a) of former section 300 over a child "[w]ho is in need of proper and effective parental care or control and has no parent ... willing to exercise or capable of exercising care or control...."

Effective January 1, 1989, section 300, subdivision (a) provides for juvenile court jurisdiction if "[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent...."
Section 300, subdivision (b), effective January 1, 1989, provides for juvenile court jurisdiction where [t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to provide regular care for the minor due to the parent's ... substance abuse."
[2] The petition also alleged that due to the parents' substance abuse and the fact Stephen was born with opiates in his urine and was being medically treated for withdrawal, the "minor... comes within Section[s] 300(a) and (b) of the 1989 California Welfare and Institutions Code in that: [¶] a. [T]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent ... [¶] b. [T]here is a substantial risk that the minor will suffer, serious physical harm or illness as a result of the inability of the parent to provide regular care for the minor due to the parent's substance abuse...."
[3] In so ruling, the court commented, "With the record I have here ... I am not prepared to make a finding that while a heroin addict actively engages in ingesting heroin [he or she] is able to care for a child. I would make a finding exactly to the contrary." The court continued, "And when under the influence of heroin, [the parents are unable] to exercise care and control. And the Court has convincing evidence they are addicted to heroin and has no evidence that that addiction has been cured at this time.... [¶] Substantial risk and danger to the minor? This minor is less than a month old and requires constant attention, as any infant does. And should [the parents] ingest heroin, they could not give the minor the appropriate attention it requires...."

At the conclusion of the hearing, the court stated: "The Court will find initial removal was necessary and there being a prima facie case found ... and it being a matter of immediate and urgent necessity and in the best interest and welfare of the minor, that the minor be committed to the care, custody and control of the Butte County Welfare Department to be temporarily detained, pending further order, for the reasons more specifically and at some length set out by the Court earlier in this proceeding. [¶] The Court will again make a finding on reasonable efforts with reference to elimination of the need for removal or return, with the caveat in that regard that the Court feels that those were minimal. But they were minimal because the only thing that could have been done in the Court's judgment at that juncture to avoid removal would have been to place somebody with the child at all times in light of the indication by both of the parents that they were heroin addicts. [¶] The Court will further find that there is substantial danger to the physical health of the minor should the parents ingest pursuant to their habit any further heroin, and there are no reasonable means to protect the minor from that danger without removing the minor from the parents' custody."
[4] The court also ordered that the parents' right of visitation be unlimited provided only that they "not be under the influence of any narcotic other than prescribed."
[5] The mother tested positive for amphetamines on three occasions (Dec. 19-21, 1988) and for morphine on one occasion (Dec. 30, 1988).
[6] The addendum stated in relevant part: "On Wednesday, January 4, 1989, [the mother] went to the lab to be tested.... The lab assistant accompanied [the mother] to collect the urine specimen (this was a new procedure). [The mother] stated she was not able to produce a specimen. She was given a glass of water by the assistant and directed to wait in a waiting area. [The mother] left the building without informing anyone or providing the urine specimen."
[7] CPS apparently alleged jurisdiction under both the former and present versions of section 300 because the jurisdictional hearing was to be held before January 1, 1989, and the expected date of the dispositional hearing would be after January 1, 1989, when the former version of section 300 would be superseded by the present version. No challenge is made to CPS having charged, or to the juvenile court's finding of jurisdiction, under both versions of section 300.
[8] The court again ordered that visitation be unlimited, and directed that it could take place in the parents' home provided the paternal grandparents were present.
[9] The California Medical Association appears as amicus curiae on behalf of the mother. Stephen's father did not appeal.
[10] Section 332 provides as follows: "A petition to commence proceedings in the juvenile court to declare a minor a ward or a dependent child of the court shall be verified and shall contain...: [¶] (f) A concise statement of facts, separately stated, to support the conclusion that the minor upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted."
[11] Mother did not testify at the detention, jurisdictional or dispositional hearing.
[12] Mother's brief is replete with charges the juvenile court ignored evidence presented in support of her claim that she is capable of the care and control of the minor. There was substantial testimony supporting mother's position. The test, however, is not whether there is substantial conflict, "but rather whether there is substantial evidence in favor of the respondent. If this `substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment will be affirmed." (Italics in original; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 282, p. 294.)
[13] At the dispositional hearing, counsel for mother argued that three of the tests which were positive for amphetamines were administered over a three-day period and showed nothing more than a single use of amphetamine. Mother repeats this claim on appeal and notes the claim remains uncontradicted. Contradicted or not, statements by counsel are not evidence.