Filed 6/6/24 Certified for Publication 6/28/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re B.D. et al., Persons Coming Under the Juvenile Court Law. | B327625<br><br>(Los Angeles County Super. Ct. No. 22LJJP00221A–B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>    v.<br><br>Brittany B.,<br><br>    Defendant and Appellant. | |

     APPEAL from orders of the Superior Court of Los Angeles County, Donald Buddle, Judge. Reversed.

     Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Brittany B. (mother) appeals from juvenile court orders finding her two children, B.D. and C.D., are persons described by Welfare and Institutions Code section 300, subdivision (b), and placing them under the supervision of the Los Angeles County Department of Children and Family Services (DCFS).[1]  The juvenile court sustained a petition based on allegations that C.D. was born with a positive toxicology screen for opiates, and that mother's substance abuse placed both children at substantial risk of serious physical harm.  On appeal, mother contends the evidence was insufficient to support the court's jurisdictional findings.  We agree and reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 26, 2022, DCFS received a referral reporting that mother had tested positive for opiates.  She had also tested positive for marijuana and hydrocodone six months earlier, at her first prenatal care visit, in October 2021.  On April 27, a DCFS social worker interviewed mother in the hospital.  Mother said the week before giving birth she was experiencing back pain related to her sciatic nerve.  She explained that her aunt gave her

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2

a Norco pill.[2]  Mother claimed this was the only time she took the medication during her pregnancy.

Mother informed the social worker that she had received prenatal care while pregnant with C.D.  She admitted testing positive for marijuana and opiates at her first prenatal care visit.  Mother said she was unaware that she was pregnant when she used the marijuana and, at the time, she had taken Norco to alleviate her back pain.  The Norco was prescribed to her after an oral surgery.  According to mother, the doctor providing her prenatal care did not express concern about the positive drug test.  Mother stopped using marijuana when she found out she was pregnant and did not use Norco again until the week before giving birth.  When asked if she would be willing to drug test for DCFS, mother said she did not understand why she would be asked to test and would only do so if it was "a requirement."

The social worker also asked mother about her older child, B.D.  Mother said B.D., then three years old, was up to date with immunizations and physicals.  B.D. received regular medical and dental care.

Mother was attentive to C.D. and was bonding well with him.  She fed and soothed him.  A nurse told the DCFS social worker that the drug screening completed at the hospital did not provide the levels of drugs in mother's system.  C.D.'s urine sample was negative for substances.  C.D. was born by cesarean section and mother had been prescribed Percocet for pain.  According to the nurse, C.D. had not displayed any symptoms of withdrawal.  A hospital social worker reported that mother was "open and forthcoming" with the information that she had taken

---

[2]     At the jurisdiction hearing, mother agreed with DCFS's counsel that Norco is a brand name for hydrocodone.

"something" for back pain prior to C.D.'s birth. The hospital social worker also indicated mother had tested positive for marijuana and hydrocodone at her first prenatal care visit. Mother had denied having a prescription for hydrocodone and said she got it from a friend. She told the hospital social worker that she used "the drugs" recreationally prior to discovering that she was pregnant.

On May 2, the social worker visited mother and the children at home. Their apartment was clean, well-organized, and "in good condition." There was "plenty [of] clothing and shoes for the children in the closet," "plenty of infant essentials," and ample food in the refrigerator, freezer, and cabinets. There were no visible safety hazards in the home.

Mother and the social worker again discussed mother's positive drug tests at C.D.'s birth and at her first prenatal care visit. Mother again said she took pain medication for her back pain and, had she known it would trigger a DCFS investigation, she would not have taken it. Mother "expressed that she felt like she was accused of being a drug addict and expressed distrust of the department." She again indicated she would only drug test if it was required of her.

On May 4, DCFS received the results of drug testing performed on C.D.'s meconium. The test was positive for hydromorphone and hydrocodone. A "client services" contact from United States Drug Testing Laboratories told the social worker the test results did not allow him to provide information regarding the time of use of the drugs, dosage, or frequency of use. He also could not confirm if the results were consistent with the use of Norco.

4

On May 19, the social worker informed mother that DCFS intended to open a case and seek court supervision. Mother denied being a drug user. She said there had been no concerns about C.D. at the hospital and he was "perfectly fine." The social worker again asked if mother would be willing to drug test for DCFS. Mother said she would need to speak to an advisor first.

A few days later, the social worker interviewed the maternal grandmother. The maternal grandmother saw mother and the children three to four times a week. She had no concerns about mother's care of the children. Maternal grandmother was not aware of mother using drugs or alcohol. She indicated she gave mother "half of her pain medication" a week before C.D. was born because mother was having bad back problems. Maternal grandmother did not believe mother abused any drugs or medications. According to maternal grandmother, mother used to smoke marijuana, but she stopped when she found out she was pregnant.

On May 27, the social worker made another scheduled visit to mother's home. B.D. appeared comfortable in the home. She was dressed in clean clothing and was "well groomed." Mother was very attentive to C.D. The home was clean and organized. Mother expressed disbelief that taking pain medication could result in DCFS opening a case. She regretted that she had taken Norco for her back pain and said it was a mistake. She insisted that her use of the drug was limited to the time before she learned she was pregnant and once in the week before C.D. was born. She denied using Norco or any other substances during her pregnancy. The social worker once again asked if mother was willing to submit to drug testing. Mother said she would test if it were court-ordered.

On June 2, a Pharmatech lab technician informed the social worker that Norco will show up on a drug test between 20 to 24 hours in the blood and for up to three days in urine samples after the last use. The lab technician opined that " 'based on the low levels' " of hydromorphone and hydrocodone from C.D.'s meconium test, "it could have been a result of a onetime use by the mother near the time of the child's birth."

On June 6, DCFS filed a petition alleging the children were persons described by section 300, subdivision (b), as a result of mother's failure or inability to adequately supervise or protect them, and due to mother's inability to provide regular care due to her substance abuse. The petition alleged mother had a history of substance abuse and was a current abuser of opiates, hydromorphone, hydrocodone, Norco, and marijuana. DCFS did not seek to detain the children. At the initial hearing on June 20, the court authorized DCFS to provide mother with a drug testing referral.

On July 7, mother tested positive for hydrocodone and hydromorphone. She did not submit to any further drug testing.

A report prepared for an August 2022 jurisdiction and disposition hearing indicated that a dependency investigator visited the family on July 14. B.D. was friendly and talkative. She did not have any visible marks or bruises. C.D. was alert and comfortable with mother. He also had no visible marks, bruises, or rash. Mother told the investigator that C.D. had not spent time in the NICU or an incubator when he was born. Instead, "everything was completely normal with him." She indicated C.D. experienced no signs of withdrawal at birth, or in the three days they spent in the hospital after he was born.

Mother admitted she had taken opiates a few days before her cesarean section and that the drugs were not prescribed to her. She said she got the medication from the maternal grandmother. She took it for sciatica nerve pain. Mother denied having a substance abuse problem, indicating she had never gone to a drug rehabilitation program, or been arrested for substance use issues. She repeated that the positive test for marijuana and opiates at her first prenatal care visit resulted from her use of those drugs before she knew she was pregnant, including Norco she was prescribed after having dental work done earlier in 2021. Mother admitted she used marijuana before she got pregnant but denied she had ever been impaired. She denied taking any " 'street drugs.' "

As to the positive July 7 test, mother said she took some of the pain medication she was "released with." She explained: " 'I was going through a miscarriage and it relieved my pain.' " The report offered no further details.

The report incorporated the detention report interviews with the maternal grandmother, the hospital nurse, and the hospital social worker. There were no updated or additional interviews with anyone other than mother. Two pages of a three-page "patient history report" from Rite Aid were attached to the report, appearing to reflect that mother was prescribed a three-day supply of hydrocodone acetaminophen in January 2021, and a two-day supply of oxycodone acetaminophen in late April 2022, a few days after C.D. was born.

In assessing the children's safety in the home, the report referenced mother's positive drug tests during pregnancy and at C.D.'s birth, as well as C.D.'s positive toxicology at birth as reflected in the meconium test. The report further noted that

although mother reported she used pain medication one week before giving birth to C.D., the lab technician had indicated the medication would show positive in a urine sample "up to 3 days from last use." The report additionally indicated that while mother initially said her aunt gave her the medication she took the week before she gave birth, the maternal grandmother said *she* had given it to mother.

A November 2022 last minute information report indicated mother continued to refuse to drug test. According to the report, mother stated "her attorney informed her she does not have to drug test; therefore, it cannot be determined whether mother continues to abuse substances." Mother also declined family preservation services. A December 2022 last minute information reported DCFS's concerns that mother still refused to drug test; she "minimize[d] concerns with her use of prescription medication"; maternal grandmother also minimized mother's use of prescription medication; and mother had rejected all of the services DCFS had recommended, including parenting services, "Parents in Partnership," and connection to a DCFS cultural broker.

The jurisdiction and disposition hearing took place in January 2023. The dependency investigator testified he had visited mother once, in July 2022. The continuing social worker should have visited mother monthly, consistent with DCFS's standard practice, but the investigator had not confirmed if that had happened. During his July 2022 visit, the investigator had no concerns with the condition of mother's home or with her care of the children on that date. It was his understanding that mother cooperated with monthly home visits. In conversations with the supervisor on the case, the investigator was informed of

8

concerns that mother had not participated in programs DCFS offered and had not submitted to drug testing.  Outside of those issues, he had not been informed of any safety concerns related to mother's care of the children.  In recommending family maintenance services, the investigator considered the "positive test"; that DCFS was not getting any other drug test results from mother; and "there was [an] admitted history of abusing prescription pain medication."  The investigator testified that he asked mother if she felt her use of prescription opiates was an issue, and she said it was not.

Mother also testified.  She denied ever admitting that she had abused opiates or any other drugs.  Neither child had significant medical needs.  Mother had support from her mother, her two grandparents, her sister, her aunt, and the children's father.  According to mother, a DCFS social worker visited her home twice a month.  She made the home and the children available during those visits.  She had provided the children's medical information to the social worker.  She testified that C.D. had eczema, and she was working with his doctor to treat it.  B.D. was excelling in school.

Mother testified that she last used marijuana before she was pregnant with C.D.  She would smoke it, but never in the daytime, and she was never inebriated.  At the time, she was living with the maternal grandmother, who was home when mother smoked.  Mother denied any current use of illegal substances or non-prescribed or prescribed medications.  She admitted using a non-prescribed opiate during the week or a week before C.D.'s due date.  She was having sciatic nerve problems at the time, was in a lot of pain, and thought taking the medication would be "unharmful."  She got the Norco from the

9

maternal grandmother.  Mother testified that taking the medication "wasn't wise," she wished she had not done it, she had not taken any medication when pregnant with B.D., and she would not take such medication again if she was pregnant.

On cross-examination, mother denied ever receiving pain medication from her aunt or her friends.  She testified that her dentist prescribed her hydrocodone acetaminophen, or Norco, in January 2021.  She also testified that she was prescribed oxycodone acetaminophen, or Percocet, a few days after C.D. was born.  In closing arguments, DCFS's counsel argued this testimony demonstrated mother's dishonesty about the source of the pain medication she had taken.  The meconium test results and mother's July drug test were positive for hydromorphone, which, counsel represented, is not an ingredient in Norco or Percocet.  Counsel asserted this discrepancy "raises concern that either mother is not being honest about what she is taking or she is not aware of which medication that she is taking at what point or where those medications came from."

The juvenile court amended the petition to conform to proof, adding an allegation that mother tested positive for hydrocodone and hydromorphone on July 7, 2022.  The court then sustained the petition.  The court declared the children to be dependents of the juvenile court and ordered that they remain in the home of the parents, under DCFS supervision.[3]  The court ordered DCFS to provide mother family maintenance services,

---

[3]     Although the court ordered the children "home of parents," the record indicates father did not live with mother and the children.  Father was not named in the petition, declined to participate in the proceedings below, and is not a party to this appeal.

10

including weekly drug testing that would switch to biweekly testing once mother submitted four consecutive negative drug tests.  Mother timely appealed.

## DISCUSSION

## I. Applicable Legal Principles and Standard of Review

" ' "We review the juvenile court's jurisdictional findings for sufficiency of the evidence.  [Citations.]  We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.]  'However, substantial evidence is not synonymous with any evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.]  Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]."  [Citation.]  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  [Citation.]' [Citation.]" ' [Citation.]" (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 (*J.A.*).)

As relevant here, under section 300, subdivision (b), a child may be subject to dependency jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of a parent's failure or inability to adequately supervise the child, or as a result of a parent's inability to provide regular care for the child due to the parent's substance abuse.  (§ 300, subd. (b)(1)(A) & (D).)

11

## II. Substantial Evidence Did Not Support the Jurisdictional Findings

Mother first argues the evidence did not support the juvenile court's finding that she engaged in substance abuse. Although the evidence was far from overwhelming, it does not wholly support mother's argument. Mother tested positive for hydrocodone at her first prenatal visit in October 2021. Shortly before she gave birth to C.D., mother used a prescription drug that was not prescribed for her, leading to her and C.D. testing positive for opiates when he was born. Mother's explanation of her use of pain medication at that time was undermined by the drug test results showing the presence of a substance—hydromorphone—which did not appear to correspond with the medication she said she received from the maternal grandmother.

Despite insisting that she did not abuse prescription medication, mother declined to drug test voluntarily.[4] In the one drug test she did take, three months after C.D.'s birth, she again tested positive for opiates. Although mother had received a prescription for oxycodone acetaminophen months earlier, she

---

[4] As the court explained in *In re E.E.* (2020) 49 Cal.App.5th 195, 202 (*E.E.*), before the court asserts dependency jurisdiction over a child, it cannot order parents to submit to drug testing. A parent's participation in services at this stage of the proceedings is voluntary. (*Id*. at p. 209.) Nonetheless, one reasonable inference from a parent's refusal to submit to drug testing at the agency's request, knowing that the agency is attempting to confirm or rule out substance abuse, is that the parent fears such tests would be positive. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186 [father's failure to drug test created reasonable inference that his marijuana use was more frequent than he admitted].)

12

tested positive for hydrocodone and hydromorphone, suggesting she had again taken medication that was not prescribed for her. Further, that mother had done so, while knowing that DCFS was investigating her family because of her use of prescription drugs, opened the door to an inference that she was unable to abstain from using the drugs. (*E.E.*, *supra*, 49 Cal.App.5th at p. 214 [juvenile court could reasonably disbelieve mother's claim that she was no longer using drugs given her implausible denial of the extent of drug use while pregnant, evasive behavior, and resistance to monitoring and services].)

However, even assuming the above evidence was sufficient to support the conclusion that mother was abusing prescription drugs, that did not end the jurisdictional analysis. "Even with sufficient proof of substance abuse, the government also bears the burden of proving by a preponderance of the evidence . . . that this abuse makes the parent . . . unable to provide regular care for a child, and that this inability has caused a child to suffer serious physical harm or illness or places the child at substantial risk of serious physical harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 550 (*N.R.*).) We need not determine whether the record before the juvenile court was sufficient to support a finding of substance abuse because, even if it was, the evidence was insufficient to support a finding of serious physical harm, or a substantial risk of serious physical harm to the children.

A. **There was no substantial evidence that C.D. suffered serious physical harm or illness**

The juvenile court sustained an allegation that C.D. "was born suffering from a detrimental condition consisting of a positive toxicology screen for opiates . . . . Such condition would not exist except as the result of unreasonable acts by [mother],

13

placing the child at risk of physical harm and damage.  The mother's substance abuse endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger."

As DCFS asserts on appeal, several courts have concluded that a newborn's positive toxicology for drugs is evidence that supports a jurisdictional finding.  (See e.g., *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 (*Christopher R.*), disapproved of on another ground in *In re N.R.*, *supra,* 15 Cal.5th at p. 560, fn. 18 [mother's drug use while pregnant "unquestionably" endangered health and safety of unborn child; mother's drug use during pregnancy combined with history of drug use and failure to treat problem justified dependency jurisdiction]; *In re Monique T.* (1992) 2 Cal.App.4th 1372 (*Monique T.*); *In re Stephen W.* (1990) 221 Cal.App.3d 629 (*Stephen W.*); *In re Troy D.* (1989) 215 Cal.App.3d 889 (*Troy D.*).)[5]

Indeed, some courts, relying on section 355.1, subdivision (a), have concluded a newborn's positive toxicology screen at birth creates a legal presumption that the child is a

---

[5]  *Troy D.* also included a discussion of former Penal Code section 11166, which the court held would require a hospital social worker to make a report to a child protective agency if the worker concluded a newborn's positive toxicology test results raised a reasonable suspicion of child abuse.  We note that under current law, Penal Code section 11165.13 provides that for purposes of mandated child abuse and neglect reporting, "a positive toxicology screen at the time of the delivery of an infant is not in and of itself a sufficient basis for reporting child abuse or neglect."  Instead, a report is to be made "[i]f other factors are present that indicate risk to a child . . . ."  (Pen. Code, § 11165.13.)

person described by section 300, subdivision (b). (*Monique T.*, *supra*, 2 Cal.App.4th at p. 1378; *Stephen W.*, *supra*, 221 Cal.App.3d at pp. 638–639; *Troy D.*, *supra*, 215 Cal.App.3d at p. 897.) While DCFS has not expressly invoked section 355.1, subdivision (a) in this case, the petition's allegation as to C.D. incorporates portions of the provision's language: "Where the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, . . . that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (See *In re D.P.* (2014) 225 Cal.App.4th 898, 904 [agency provides adequate notice that it will rely on section 355.1 presumption by borrowing its language in the petition].)

We conclude, however, that the evidence was insufficient for DCFS to rely on the section 355.1, subdivision (a) presumption in this case. It was undisputed that, despite the positive toxicology from C.D.'s meconium, C.D. did not suffer any apparent adverse physical symptoms of prenatal drug exposure. He did not experience symptoms of drug withdrawal. There was no evidence that he was premature, underweight, or unhealthy in any way. Although the evidence indicated mother had taken a drug that was not prescribed for her, it was also undisputed that the drugs in her system, and that showed up in C.D.'s meconium, were prescription drugs, not categorically illegal narcotics. The lab technician who provided the only "professional" evidence, indicated the levels of the drugs in C.D.'s meconium were "low" and consistent with mother's one-time use of pain medication. There was no "competent professional evidence" that mother

15

taking prescription pain medicine during pregnancy was unreasonable, or that C.D.'s birth with those drugs in his meconium was in fact a detrimental condition.

Moreover, even if the juvenile court did not rely on the presumption and instead considered the totality of the evidence, substantial evidence did not support a finding that C.D.'s positive toxicology screen at birth alone established he had suffered serious physical harm or illness as a result of mother's substance abuse. There was no evidence that the presence of a low level of an opioid substance consistent with a one-time use of prescription pain medication by mother constituted serious physical harm or illness. Aside from the positive toxicology screen, there was no evidence that C.D. experienced any medical problems or concerns at birth or after.

On appeal, DCFS attempts to rely on *Troy D.* and *Stephen W.* by asserting that neither case held that evidence of addiction and withdrawal symptoms is *necessary* to support a finding of jurisdiction based on a newborn's positive toxicology screen. DCFS thus suggests a positive toxicology screen at birth alone may be enough to support a jurisdictional finding. Neither case supports DCFS's argument.

In both *Troy D.* and *Stephen W.*, the children were born testing positive for "dangerous," illegal drugs. (*Stephen W.*, *supra*, 221 Cal.App.3d at p. 634 [minor positive for opiates and mother admitted heroin use prior to the birth]; *Troy D.*, *supra*, 215 Cal.App.3d at p. 895 [minor born positive for amphetamines and opiates].) In both cases, the record included testimony from doctors about the effects of prenatal drug use, both in general and on the children in question. (*Stephen W.*, at pp. 642–643; *Troy D.*, at p. 904.) And, in both cases, the children were suffering

16

demonstrable negative physical effects connected to their mothers' prenatal drug use. (*Stephen W.*, at p. 642; *Troy D.*, at p. 904.) Neither court had occasion to decide whether the section 355.1, subdivision (a) presumption would apply, or whether there would be substantial evidence to support jurisdiction, in the absence of competent professional evidence about the dangerousness of the drugs or the effects of those drugs on the child, or in the absence of evidence of physical harm. (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10 [cases are not authority for propositions not considered].)

Similarly, in *Christopher R.*, the court indicated the mother's use of "cocaine (and, based on the positive toxicology screen for [the youngest minor] at birth, amphetamine and methamphetamine) while she was pregnant, unquestionably endanger[ed] the health and safety of her unborn child." (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1217.) However, the mother conceded dependency jurisdiction was proper as to the child who was born with a positive toxicology screen for cocaine and "other illicit drugs." She contested the court's jurisdictional findings only as to her older children. (*Id*. at p. 1215.) The court therefore did not consider the circumstances under which the section 355.1, subdivision (a) presumption would apply, or whether evidence of positive toxicology at birth alone is sufficient to support a jurisdictional finding.[6] *Christopher R.* does not assist DCFS's argument.

---

[6] Although the drug-exposed infant in *Christopher R.* did not have withdrawal symptoms or ongoing health problems, the court noted she was born with low birth weight and respiratory issues that required her to receive oxygen and be fed intravenously.

17

In contrast, we find *J.A.*, *supra*, 47 Cal.App.5th 1036 instructive. J.A.'s younger sibling was born with a positive toxicology screen for marijuana. The mother also tested positive and admitted she had used medical marijuana throughout her pregnancy, without informing her doctor. (*Id.* at p. 1038.) The infant did not appear to have any developmental concerns. A nurse explained that delays due to the prenatal marijuana exposure could become apparent when the child was older. There was no other evidence of actual or anticipated harm. The appellate court concluded there was no evidence that the mother's substance abuse placed her children at substantial risk of harm. As a result, the only possible basis for jurisdiction was the fact that the infant tested positive for marijuana at birth. DCFS relied on the section 355.1 presumption, as reflected in cases such as *Troy D.*, to assert that the infant's positive toxicology screen alone created a presumption that dependency jurisdiction was warranted.

The *J.A.* court concluded the presumption did not apply. Referring to *Troy D.*, the court reasoned that application of the presumption "when a child is 'diagnosed as being born under the influence of a dangerous drug,' such as morphine and methamphetamine, is clear. . . . Being born 'under the influence of a dangerous drug' is obviously a 'detrimental condition' within the meaning of the statutory presumption." (*J.A.*, *supra*, 47 Cal.App.5th at p. 1049.) The court further explained that the

_____

She remained in the hospital for 25 days after birth. (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1213.) Thus, it is not clear that the court was presented with a situation in which the infant suffered no discernable negative effects from the mother's prenatal drug use.

18

circumstances of the children's births in *Monique T.* and *Christopher R.* clearly reflected detrimental conditions. (*Ibid*.) In *Monique T.*, the infant tested positive for cocaine at birth and suffered severe medical problems. As noted above, the infant in *Christopher R.* tested positive at birth for cocaine, amphetamine, and methamphetamine. (*Ibid*.)

However, the record before the *J.A.* court included no competent professional evidence of an injury or detrimental condition. The evidence showed only that the child tested positive for cannabinoids. He did not appear to be developmentally delayed. The court thus concluded: "Although understandably neither DCFS nor the trial court condones edible marijuana use while pregnant, DCFS acknowledges there is no injury, and the medical condition of prenatal exposure carries only some unexplained degree of possible future detriment. This is insufficient to trigger the presumption such that there is a substantial risk of harm to Baby from mother's admitted prenatal consumption of marijuana edibles." (*J.A.*, *supra*, 47 Cal.App.5th at p. 1049.)

Likewise, here, the evidence of prenatal exposure to prescription pain medication alone was insufficient to trigger the section 355.1 presumption. It further did not, by itself, constitute substantial evidence that C.D. suffered serious physical harm or illness as a result of mother's substance abuse. While it is not difficult to imagine that the use of prescription opioids during pregnancy *could* result in a child being born with injuries or suffering from a detrimental condition or physical harm, substantial evidence requires more than speculation or conjecture. Inferences must rest on evidence. No such evidence was adduced in this case.

**III.  Substantial Evidence Did Not Support a Finding of a Substantial Risk the Children Will Suffer Serious Physical Harm or Illness**

Dependency jurisdiction is also appropriate under section 300, subdivision (b), when there is a substantial risk that a child will suffer serious physical harm or illness as a result of a parent's inability to adequately supervise the child, or the parent's inability to provide regular care for the child, because of the parent's substance abuse.  Indeed, the court need not wait until a child is injured to assume jurisdiction and take steps to protect a child.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

At the same time, as the California Supreme Court recently clarified in *N.R.*, even when children are very young, "it is inappropriate to regard a parent's . . . excessive use of alcohol or an addictive drug as always being sufficient, by itself, to show that the parent . . . is unable to provide regular care for a young child and that the child is therefore at substantial risk of serious physical harm."  (*N.R.*, *supra*, 15 Cal.5th at pp. 558–559.)  Instead, "an inability to provide regular care and a substantial risk of serious physical harm or illness must be established on the facts of each case . . . ."  (*Id.* at p. 559.)[7]

---

[7]    The *N.R.* court rejected the "tender years presumption," namely "the position that a 'finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm' to a child of ' "tender years." ' [Citation.]" (*N.R.*, *supra*, 15 Cal.5th at pp. 556–557.)  Although minors' counsel and counsel for DCFS referred to "tender years" in their arguments to the juvenile court below, the record does not clearly indicate that the court relied on the tender years presumption in making its jurisdictional findings.

Here, again assuming the evidence was sufficient to establish that mother abused prescription drugs, the record still lacks substantial evidence that mother's substance abuse rendered her unable to adequately supervise the children or to provide regular care for them, and that the inability placed the children at substantial risk of suffering serious physical harm or illness.

There was no evidence that mother's substance use or abuse endangered the children prior to the instant case. Although DCFS located a prior referral from April 2021 about the family, it concerned only potential domestic violence with father. The referral was closed with the assessment that the risk of neglect was low. DCFS reported at the time that the family had no prior DCFS history and mother had "shown resilience and strength in her parenting." Mother had a prior arrest from 2015 for corporal injury to a spouse, but no other criminal history. There was no evidence of abuse or neglect in the household and mother had "proven her ability to adequately care for [B.D.'s] needs . . . ."

At the hospital when C.D. was born, the DCFS social worker noted mother was attentive to C.D. and was caring for him appropriately. Neither the nurse nor the hospital social worker expressed any concerns about mother's ability to care for C.D. In each documented visit to mother's home, social workers found no concerns with the state of the home or mother's care of the children. DCFS also did not dispute mother's testimony that a social worker had come to her home twice a month while the case was pending. The dependency investigator was not aware of any concerns with mother's actual care of the children. DCFS interviewed only one family member, the maternal grandmother,

who expressed no concerns about mother's care of the children. At the jurisdiction hearing, mother testified that B.D. was in school and was excelling. DCFS did not dispute that testimony.[8] Mother testified that both children received regular medical care and B.D. had regular dental care. DCFS did not dispute that testimony either.

There was no evidence that mother engaged in drug-related behavior that might put the children at risk of harm. (See e.g., *In re L.W.* (2019) 32 Cal.App.5th 840, 850 [that mother was arrested twice for driving under the influence was evidence of substance abuse spilling into areas that would pose substantial risk of physical harm to 13-year-old].) There was no evidence that mother was impaired when caring for the children. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1380, disapproved of on another ground in *In re N.R., supra*, 15 Cal.5th at p. 560, fn. 18 [mother was visibly under the influence of illicit drugs during visits, refused to drug test or tried to cheat test].) There was no evidence that mother had a prior child welfare history related to substance abuse or inadequate care of the children. (*Id.* at pp. 1384–1385 [mother's continuous illicit drug use led to removal of older children; infant was at substantial risk of harm].) DCFS offered no evidence about the effects or characteristics of prescription drug abuse generally. (*Stephen W., supra*, 221 Cal.App.3d at pp. 642–643 [expert testified that: heroin addicts nod off and could not attend to a newborn; couples who are addicts often use at the same time; there is risk of overdose from

---

[8]     Presumably the social workers visiting mother's home twice a month between June 2022 and January 2023 learned that B.D. had apparently started preschool. There is no indication that DCFS attempted to interview anyone from the school.

22

drug being cut with other substances; an unstable lifestyle goes along with the addiction].) Further, DCFS offered no evidence to explain mother's positive July 2022 drug test, such that the court could have drawn inferences about mother's ability or inability to safely care for the children based on the test results alone. While mother declined DCFS services and drug testing, there was no evidence that she was otherwise secretive, tried to keep DCFS from having access to the children, or obstructed DCFS's investigation. (*E.E.*, *supra*, 49 Cal.App.5th at pp. 213–214 [mother was dishonest about drug use during pregnancy, was evasive, tried to set up a guardianship to keep children from being detained].)

On appeal, DCFS argues mother has conceded jurisdiction was proper based on her use of marijuana, since she failed to mention that allegation in her opening brief. We disagree. Mother's opening brief adequately challenged the entirety of the juvenile court's jurisdictional findings, and we agree with mother that there was no evidence that she abused marijuana. The only reported positive test mother had for marijuana was at an October 2021 prenatal visit, months before DCFS became involved with the family. Mother did not test positive for marijuana at C.D.'s birth or in July 2022. There was no evidence that mother's use of marijuana was ongoing, much less that it rose to the level of substance abuse. There was similarly no evidence that mother smoked marijuana in the presence of the children, potentially subjecting them to second-hand marijuana smoke, as DCFS asserts on appeal.

DCFS's remaining arguments concern mother's actual and presumed use of unprescribed opiates. Yet, as explained above, substance abuse is not by itself sufficient to show a parent cannot

23

provide regular care for a child and that the child is therefore at risk of serious physical harm.  (*N.R.*, *supra*, 15 Cal.5th at pp. 558–559.)  DCFS was required to "present evidence of a specific, nonspeculative and substantial risk . . . of serious physical harm" to the children.  (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.)  It failed to do so.

On the record before us, the jurisdiction findings under section 300, subdivision (b) must be reversed, and the disposition and all subsequent orders vacated.[9]

---

[9] We recognize that over a year has passed since the juvenile court entered the orders that we now review, and circumstances may have changed.  "Our conclusion that the sustained allegations of the petition do not support jurisdiction does not mean [that] DCFS cannot try again. . . .  [I]t is entirely possible valid grounds exist for the state to assume jurisdiction over these children . . . ."  (*In re Janet T.* (2001) 93 Cal.App.4th 377, 392.)

## DISPOSITION

The orders of the juvenile court are reversed.


                              ADAMS, J.


We concur:




                    LAVIN, Acting P. J.




                    EGERTON, J.

Filed 6/28/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re B.D. et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | No. B327625 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22LJJP00221A–B) |
| v. | |
| Brittany B., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on June 6, 2024, was not certified for publication in the Official Reports. Upon request by appellant and a non-party to this action, and good cause appearing, it is ordered that the opinion shall be published in the Official Reports.

Pursuant to California Rules of Court, rule 8.1105(b), this opinion is certified for publication.

_____

LAVIN, Acting P. J.          EGERTON, J.

ADAMS, J.